NICHOLS v. NICHOLS et al., Appellants.

Division One, December 23, 1898. *

1. **Tort:** SEPARATION OF HUSBAND AND WIFE: LOSS OF AFFECTIONS. Where parents have wrongfully induced and caused their son to abandon his wife, she has a right of action against them, whether his affections for her have been wholly alienated at the time or not.

2. ———: ———: ———: RIGHT OF ACTION. The wife is entitled to the aid, support, protection, comfort and society of her husband; and for a wrongful deprivation thereof by any person she has a right of action. Loss of affections is not an essential element of the cause of action. And though he may retain some affection for her at the time suit is brought, yet it can not on that account be said that the cause of action has not matured.

3. ———: ———: ———: ———: MEASURE OF DAMAGE: INSTRUCTION. In an action by a wife against her husband's parents for causing him to abandon her, an instruction that limits her right of recovery to the value of her support, the value of the association and counsel of her husband, and of whatever enjoyment of his love of which she had been deprived, up to the time of the commencement of the suit, was properly excluded.

4. ———: ———: ———: EVIDENCE: WORTH OF DEFENDANT. It is not error in such an action to permit plaintiff to show the value of defendant's property, if her recovery is limited to compensatory damages.

5. ———: ———: ———: EXCESSIVE VERDICT: PASSION AND PREJUDICE. It is held that a verdict for $5,000.50 in this case, which is an action by a wife against her husband's parents for causing him to separate from her, is not so large as to shock the judicial sense of justice, or to warrant the belief that it was the product of corruption, passion, sympathy or prejudice.

6. **Evidence:** NEW MATTER IN CROSS-EXAMINATION: WAIVED. Where plaintiff is examined on cross-examination about new matters concerning which she had not been questioned on the examination in chief, she is thereby made the witness of defendants as to such matters, and her incompetency to testify concerning them is waived by defendants. And when defendants had examined plaintiff as to these new matters, her own counsel had the right to cross-examine her as to them.

*NOTE.—Decided June 23, 1898. Rehear and again affirmed December 23, 1898.

7. **Tort of Married Woman:** HUSBAND'S LIABILITY. At common law the husband is liable to an action for damages caused by the torts or wrongful acts his wife committed during coverture. And this liability has not been changed or limited by statute in Missouri. (*On rehearing.*)

*Appeal from Vernon Circuit Court.*—HON. D. P. STRATTON, Judge. ·

AFFIRMED.

TUCKER & MOORE and THURMAN & WRAY for appellants.

(1) The right of a wife to maintain an action for the loss of the consortium of her husband did not exist at common law, and its existence is only recognized in this State by virtue of the recent legislation giving the wife a separate legal existence. Clow v. Chapman, 125 Mo. 101; Nichols v. Nichols, 134 Mo. 187. (2) The loss of society alone is not a right which constitutes within itself an element of damage. First of all there must be the loss of affection. Calloway v. Laydom, 47 Ia. 456; Logan v. Logan, 77 Ind. 559; Freese v. Tripp, 70 Ill. 503; Confrey v. Stark, 73 Ill. 187. The loss of the husband's affections must of necessity constitute the basis of her right to maintain this action against third parties, and recover for the loss of "society, comfort, companionship, protection and aid," they being only the ordinary and legitimate results of the loss of affections, as pain and suffering is the result of personal injury. Reinhart v. Bills, 82 Mo. 534. (4) The wife has no right of action against a third party for the false imprisonment of the husband, for any kind of personal injury to the husband which does not result in death, although it disables him from maintaining and protecting her. Or for any sort of injury to his person or property, although it may deprive her of his "society, comfort, companionship, protection and aid." 9 Am. and Eng. Ency. of Law, 832; Logan v. Logan, 77 Ind. 538; McNamara v. Slavens, 76 Mo. 329; Gibbs v. Hannibal, 82 Mo. 143; Baker

v. Railroad, 91 Mo. 94. (5) A demurrer ought to have been sustained to plaintiff's case. There is no substantial evidence in this record tending to prove defendants, or either of them, were guilty of any intended malicious act, or of any act that deprived plaintiff of her husband's affections, companionship and aid. It devolved upon the plaintiff to show that the defendants did some act or were guilty of speaking some word which poisoned the mind of plaintiff's husband against her so as to bring about the results charged in her petition. Lynch v. Knight, 9 H. L. 577; Mehrhoff v. Mehrhoff, 26 Fed. Rep. 13; Modisett v. McPike, 74 Mo. 647; Hutchison v. Peak, 5 Johns. 195; Bennett v. Smith, 21 Barb. 439; Pollock v. Pollock, 29 N. Y. S. 37; Reed v. Reed, 6 Ind. App. 317; Young v. Young, 8 Wash. 81; VanOlinda v. Hall, 34 N. Y. S. 777. (6) No action will lie when the cause of action did not exist at the time the suit was commenced. Jennings v. Zerr & Jennings, 48 Mo. App. 528; Weinwick v. Bender, 33 Mo. 80; McDowell Co. v. Morgan, 33 Mo. 555; Tobin v. McCann, 17 Mo. App. 481; Worth v. Springfield, 22 Mo. App. 12; Heard v. Ritchey, 112 Mo. 516; Turk v. Stahl, 53 Mo. 437; Duryee v. Turner, 20 Mo. App. 34. (7) If the plaintiff at the time of bringing this suit was in possession of her husband's affections, and the testimony shows she was, then a union with her husband would have restored her to his society, comfort, companionship and all the protection and aid he as such husband could give her. So that she could not recover for such injury subsequent to the date of the filing of her petition, and defendants' instruction number 15, limiting her right of recovery to the commencement of the suit, ought to have been given. Carson v. Springfield, 48 Mo. App. 296; Puney v. Berry, 61 Mo. 359; Brown v. Railroad, 80 Mo. 457; Ross v. Kansas City, 48 Mo. App. 440; Biglow v. Railroad, 48 Mo. App. 368. (8) A husband is not liable for the torts of his wife committed out of

his presence and without his consent. The modern legislation of this State has so changed the legal status of a married woman as to make her the legal entity, the owner in her own right of all her property, and to allow her to sue and be sued as a *feme sole* so that the reason of the rule at common law has ceased to exist and, therefore, the rule itself has become a "barren technicality" and therefore abrogated. 2 Bish. Mar. Women, secs. 254, 255, 256, 267, 268 and 269; Rowe v. Smith, 45 N. Y. 230; Quilty v. Battie, 135 N. Y. 201; Fitzgerald v. Quann, 17 N. E. Rep. 354; R. S. 1889, secs. 6864, 6868 and 6869; Arnold v. Willis, 128 Mo. 145; Clow v. Chapman, 125 Mo. 107; Lane v. Bryant, 37 S. W. Rep. 584; Norris v. Cockrill, 32 Kan. 409; Vocht v. Kuklence, 119 Pa. St. 365.

COLE & BURNETT and TIMMONDS & TIMMONDS for respondent.

(1) The plaintiff was entitled to recover for this unwarranted invasion of her marital and personal rights. Clow v. Chapman, 125 Mo. 101; Nichols v. Nichols, 134 Mo. 187; Rice v. Rice, 62 N. W. Rep. 833; Williams v. Williams, 37 Pac. Rep. 614; Hodgkinson v. Hodgkinson, 43 Neb. 269; Bailey v. Bailey, 63 N. W. Rep. 341; Price v. Price, 60 N. W. Rep. 202; Cooley on Torts, 153; Bigelow on Torts, p. 227; Bishop, Mar. and Div., secs. 1358 and 1374; 31 Cent. Law Journal, pp. 23 and 241; Bennett v. Bennett, 116 N. Y. 584; Jaynes v. Jaynes, 39 Hun. 40. (2) Appellants seem to rely upon the fact that loss of affection is necessary to maintain an action of this kind; in this they are mistaken. The action is based upon the loss of companionship and society. Clow v. Chapman, 125 Mo. 103; Bigaonette v. Paulet, 134 Mass. 125; Warren v. Warren, 50 N. W. Rep. 842; Lockwood v. Lockwood, 70 N. W. Rep. 784; Westlake v. Westlake, 34 Ohio St. 621;

Modisett v. McPike, 74 Mo. 639.   (3)   The financial con-
dition of both plaintiff and defendant may be shown, when
there are circumstances of oppression or malice and where
exemplary damages are allowable.  Beck v. Dowell, 111
Mo. 506; Buckley v. Knapp, 48 Mo. 152.   (4)   It does not
lie in the mouth of defendants to complain of plaintiff's
testimony as to the meetings and conversations between her
and her husband, especially when the record shows these
facts to have been brought out on cross-examination by de-
tendants' counsel. However, under the following authorities
such testimony would be competent anyhow.   Williams v.
Williams, 37 Pac. Rep. 614; Glass v. Bennett, 89 Tenn. 478;
Holtz v. Dick, 42 Ohio St. 23; Edgell v. Francis, 66 Mich.
303.   (5)   The common law liability of a husband for the
torts of his wife has not been abrogated by the Married
Women's Act of this State.   Flesh v. Lindsay, 115 Mo. 1;
Wirt v. Dinan, 44 Mo. App. 583; Ingelfritz v. Ingelfritz, 49
Mo. App. 475; McCorkle v. Goldsmith, 60 Mo. App. 475;
Plummer v. City of Milan, 70 Mo. App. 598; Lindell Real
Estate Co. v. Lindell, 142 Mo. 78; Thompson v. Street Rail-
way, 135 Mo. 217; Bains v. Bullock, 129 Mo. 119; Russell
v. Russell, 122 Mo. 236; Brown v. Dressler, 125 Mo. 590;
Gabriel v. Mullen, 111 Mo. 119; State v. MaFoo, 110 Mo. 7;
Crawford v. Whitmore, 120 Mo. 144; Luse v. Oaks, 36
Iowa, 562; Fitzgerald v. Quann, 109 N. Y. 441; McElfresh
v. Kirkendall, 36 Iowa, 224; Ferguson v. Brooks, 67 Mo.
251; Knowing v. Morley, 57 Barb. 479; McQueen v. Ful-
gham, 27 Tex. 463; Fowler v. Chichester, 26 Ohio St. 9;
Perkins v. Perkins, 62 Barb. 531; White v. Woger, 25 N. Y.
333; Morgan v. Kennedy, 64 N. W. Rep. 912.

BRACE, P. J.—The defendants are husband and wife.
This is an action by the plaintiff against them to recover
damages for wrongfully inducing her husband George
Nichols, who is the only son of the defendants, to abandon
her, and to live separate and apart from her, thereby

depriving her of his affection, companionship, society, protection and support, in which the plaintiff obtained judgment in the circuit court for $5,000.50, and the defendants appeal. The case has been here before on plaintiff's appeal from a judgment of the circuit court sustaining a demurrer to the petition, on which appeal the petition was held sufficient by this court, the judgment reversed and the cause remanded for trial. See Nichols v. Nichols, 134 Mo. 187, where the petition is set out *in haec verba.* After the cause was remanded the defendants filed separate answers to the petition, in each of which the relationship of the parties is admitted, and all the other material allegations of the petition are denied, and upon the issues thus joined the case was submitted by the court to the jury upon the following instructions, omitting those not bearing directly upon the issue, after refusing to give twenty instructions asked for by the defendants.

Instructions for plaintiff:

"3. A wife is entitled to the society, companionship, comfort, protection and aid of her husband. The law gives her a right of action against any person who willfully and maliciously entices, persuades, induces or influences her husband to separate or remain apart from her. Therefore, if you shall believe from the evidence that the defendants willfully and maliciously acted in concert or cooperated together with the purpose and intent to cause the separation of the plaintiff's husband from her and to cause him to remain apart from her, and that they did thereby accomplish such purpose and intent, then your verdict shall be in favor of the plaintiff, and you should assess her damages at such sum as you may believe from the evidence will reasonably compensate her for the deprivation and loss of her husband's society, comfort, companionship, protection and aid—provided your verdict should not exceed the sum of ten thousand dollars.

"4. The law does not justify or excuse parents in willfully and maliciously interfering in the domestic affairs of their married children; therefore, although you may believe from the evidence that the defendants are the parents of plaintiff's husband, still if you shall further believe from the evidence that they are guilty of procuring or bringing about the separation of plaintiff's husband from her and causing him to remain apart from her, as in the foregoing instruction stated, your verdict should be in favor of the plaintiff."

Instructions by the court on its own motion:

"1. Unless you believe from the preponderance or greater weight of the evidence, that the defendants willfully and maliciously induced George Nichols, the husband of the plaintiff, to cease to live with her as her husband, your verdict will be for the defendants.

"2. Although you may believe from the evidence that the defendants, or either of them, induced the husband of the plaintiff to cease to live with her as a husband, yet if you further believe from the evidence that said defendants or either of them had good reason to believe and did believe that the husband of plaintiff had good grounds to so cease to live with her as his wife, your verdict will be for the defendants.

"3. If you believe from the evidence that George Nichols, the husband of the plaintiff, ceased to live with her as her husband and of his own accord and was not influenced or induced so to do by the defendants, or either of them, your verdict will be for the defendants.

"4. If you believe from the evidence that plaintiff's husband was influenced or induced to cease to live with her as her husband solely by the defendant, Benjamin Nichols, and not by the defendant, Arpa Ann Nichols, your verdict will be for the defendant, Arpa Ann Nichols.

"5.    Your verdict will be for the defendant, Arpa Ann Nichols, unless you believe from the evidence that she influenced or induced the husband of the plaintiff to cease to live with her as her husband."

It appears from the evidence that on the eleventh day of February, 1892, with the knowledge and consent of the parents of both parties, the plaintiff, then aged about twenty, and George Nichols, then aged about twenty-five years, were married in the city of Lamar, in Barton county, where her parents resided; and where, just without the city limits on a farm, the defendants also resided.    That shortly thereafter they went to housekeeping in the town of Liberal on the railroad west of Lamar, and distant therefrom about fifteen miles, in a house belonging to the defendants, in one room of which they kept a small notion and millinery store, the plaintiff doing all her own housekeeping work, and assisting in the store.    That from the time of the marriage until Sunday the twenty-sixth of March, 1893, they lived happily together in the marital relation.    In pursuance of an arrangement theretofore made, they left their home on the morning of that day and went to Lamar by horse and spring wagon, where they stayed all night with the plaintiff's parents, with the understanding that next morning the plaintiff and her mother would take the conveyance and pay a visit to some friends in Sheldon, a town about twelve miles north of Lamar, and return the same evening, where she was expected to purchase some goods for the store and return to her home by train that evening or the next morning, while George would go to his father's for a few days to assist him on the farm. With this understanding she retained the keys, and went with her mother to Sheldon.    It rained, however, Monday afternoon, and plaintiff and her mother were prevented from making their return trip to Lamar until Tuesday.    In returning on that day they passed hastily by the farm of the defendants where she saw her

husband and his father, reached Lamar too late, however, to make her purchases and return to Liberal by the train that evening; stayed all night with her parents at Lamar, reached her home in Liberal by the early train Wednesday morning, March 29, at six o'clock, and at once opened the store and resumed her duties. Soon thereafter Mr. Comfort, editor of the "Enterprise," a newspaper published in Liberal, came into her place of business and showed her the following notice and accompanying letter addressed to him and mailed at Lamar the day before:

"TAKE NOTICE.—All persons are hereby forbidden harboring or trusting my wife, Victoria Charlesworth Nichols, on my account, as I shall not pay any debts of her contracting after this date.   Lamar, Mo., March 28th, 1893.

"GEORGE B. NICHOLS.'

"Esq. Comfort.   Dear Sir:   Please publish the above notice (if possible) in this week's number of your paper and charge to me.                    B. NICHOLS."

About the same time a like notice was delivered by Benjamin Nichols to H. C. Brandon, editor of the "Lamar Democrat," with a request to publish it in the next issue, and for the publication of which he then paid Brandon. The plaintiff was very much shocked when the notice was shown her by Comfort, and on Wednesday afternoon returned to Lamar by the 4 o'clock train to see her husband and ascertain what the notice meant. She testified that when she and her mother passed her husband and his father on Tuesday, she said "Good morning" to her husband, but that he did not speak, and that when his father saw them approaching he turned his back, and she supposed they were angry because she had not returned as promptly from Sheldon as was expected.   That when she arrived at Lamar Wednesday afternoon she saw her husband and his mother in a wagon in one of the streets of the public square, going home to the farm; that she called to her husband and told him to stop,

that she wanted to talk with him; that he stopped and she asked him what the notice meant that was sent to Liberal. His mother answered for him, and said, "It means just what it says; you have been extravagant and running him in debt, and we are going to take George home, and take care of him. You can go home and let your mother take care of you." That the plaintiff then told George she would like to talk with him; that as he started to get out of the wagon his mother took hold of his coat sleeve and said "Come on, you are not going;" that he got out of the wagon, when plaintiff said to him, if he was going home with her, to come over to the house (meaning her parents' house) that night, and he said "all right," and his mother said "no you won't," and took hold of his sleeve, and he got in the wagon and drove off with his mother, leaving her standing in the street. The meeting seems to have attracted the attention of the by-standers, one of whom was examined as a witness, and corroborated the plaintiff's testimony. She returned to her parents' home, where she remained that night, but her husband did not come to see her, and the next morning, Thursday, March 30, she returned to her home in Liberal. The evidence tends to prove that on Wednesday evening George turned over all his property at Liberal to his father; that his father furnished his mother with money to pay Comfort for publishing the notice, and her expenses, and with a team to make a trip to Liberal, and that about noon on Thursday they appeared in the home of plaintiff, who testifies as to what then took place, as follows: "I asked my husband if he was going to leave me; he said, 'It would have to be some time, and it might as well be now.' His mother spoke up and accused me of being extravagant and running George in debt and said, "We are going to take George home and take care of him, and your mother can take care of you.' " It appears from the evidence that thereupon George and his mother moved all the goods (household and store goods)

into an adjoining building belonging to his father, and of which they had the key, leaving the plaintiff in her dismantled home with a bed, a stove, a few dishes, a rocking chair and perhaps some other little things of her own, without any means of subsistence, and without making any provision for her. She stayed there during that night and next day went to her aged parents at Lamar, with whom she has since made her home. Her husband and his mother stayed in Liberal at a neighbor's Thursday night, but her husband did not come to see her, and the next day, Friday, they commenced making sales of the property at private sale, and afterwards at public sale, and within a few days the remainder was taken to the defendants' residence, to which George and his mother returned, and where George has ever since continued to make his home, living separate and apart from his wife, his mother having paid for inserting the notice in the "Enterprise" at Liberal, before they left there. It appears that early in the following week the plaintiff consulted an attorney, and on Thursday, the fifth of April, a petition for divorce was filed in her behalf in the circuit court of Barton county on the ground that her husband "had offered her such indignities as to render her condition intolerable, in this, that he published a notice of and concerning plaintiff that she was unworthy of credit and warning all persons not to credit her on his account. That he refused to support and maintain plaintiff and left her wholly without means of support. That he allowed himself to be controlled by his mother, Arpa Ann Nichols, and had, under the influence of his said mother refused to live with, support and maintain plaintiff, knowing the plaintiff was wholly without means of support." The evidence tends to prove that the notice was published in the first issue of the "Enterprise" after it was paid for, but what the date of that issue was, does not appear. It first appeared in the "Democrat," at Lamar, in its issue of April 6.

The defendant Benjamin Nichols, on cross-examination stated that he sent the notice to the Liberal paper the day it was written and requested its publication. He said further, "I wrote the notice, I suggested it and I paid for it." In a conversation about the separation as to its cause, with and to which Squire James Dye testified, he said "he had gotten tired of things out there," and "*we* or *I* sent out and brought him home." That plaintiff "had swiped about $600 worth of his property" which he said "was sometimes called stealing." In a conversation with, and to which Judge William Dye testified, he said that plaintiff "was getting away with George's property" and he (Benjamin) "could not stand it." Another witness, L. L. Coleman, testified to the following conversation he had with Benjamin Nichols about a month or six weeks after the separation: "I asked him why it was; he just remarked in his way, he said George was not making expenses; if he had to furnish him money, that he had to bring him home with him, where he could eat grub with him; living with him would not be such an expense; I said if they get away with the money, why do you not build them a small house and let them live there; she is a good worker and he is a worker; his wife is a frugal woman; let them alone, do not break them up. He said, "It is all I can do to take care of George; the woman can go and take care of herself."

Another witness, H. S. Snyder, testified to the following conversation had with George and his mother at Liberal on the Sunday immediately following the separation: When I went in I asked George what was the occasion of the separation—if he had cause to believe she was untrue to him. He says, "No, not at all in any sense." Mrs. Nichols then remarked, "I have." Says I, "George, you and she will live together again; I want you to; this is a bad piece of work, you and she will live together again." She spoke up and said, "No, I will not allow him." She,

Mrs. Nichols, remarked, "I separated them and do not intend they shall live together again."

On the cross-examination of plaintiff by defendants' counsel, they elicited from her evidence tending to prove that after the filing of the divorce suit she had met her husband several times and had conversations with him, which meetings were concealed from his parents, two or three times at Mrs. Tuttle's, once at Mrs. Huff's, and on one occasion about the middle of May, 1893, she went with him out to Minden, a town in Barton county and stayed all night with him at the hotel, occupying the same. room. That the suit for divorce was dismissed before the present suit was instituted, which was on the third of June, 1893. That from her conversation with her husband and his letters, she was satisfied that she did not lose his affections until some time after this suit was instituted, when he ceased speaking to her when they casually met, and that up to that time she thought he would have been willing to live with her if he had not been prevented by his parents.    She was interrogated by counsel for the defense as to what she said, and what George said in some of these conversations, and when being re-examined by her counsel as to one of these conversations at Mrs. Tuttle's, concerning which she had been thus interrogated, she testified that he told her that when he wanted to come up town in order to come to see her at her mother's on the Tuesday night of the scene on the public square, his father met him at the door and said "You are not leaving here to go out there, if you go, you will go over my dead body—you will not go, you shall not go to-night at all."    .   .   .   "He said he made two efforts to come and they would not let him, that they forbid him ever seeing me."

I.   The foregoing is substantially the case made for the plaintiff by the evidence.   At the close of plaintiff's evidence, the defendants interposed a demurrer thereto,

and renewed the same at the close of all the evidence, and now contend for reversal of the judgment that the court committed error in refusing to sustain the demurrer to the evidence, and in submitting the case to the jury on the instructions hereinbefore set out, for the reason that no action will lie when the cause of action did not exist at the time the suit was commenced, and that plaintiff's own testimony as well as all the facts and circumstances show conclusively that until after she brought this suit her husband's affections were not alienated. Therefore, it appears from the uncontradicted evidence that she had no cause of action against the defendants at the time the suit was instituted.

At common law "the husband is entitled to recover damages in an action on the case against such as persuade the wife to live separate from him without a sufficient cause  or against such as 'take her away' either by fraud and persuasion or open violence." [Blackstone, Book, 3, Chap. 8, p. III; Cooley's Ed., s. p. 139.] "The common law gives him the right to sue for damages, all persons who entice her away, or induce her to live apart from him." [Schouler's Dom. Rel. (5 Ed.), sec. 41; Cooley on Torts (2 Ed.), p. 262, sec. 2.] And this whether the wrongdoer be the father of the wife, or any other person. [Modisett v. McPike, 74 Mo. 636; Hutcheson v. Peck, 5 Johnston, 195.]

In Clow v. Chapman, 125 Mo. 103, it was said: "The common law gives a husband an action for damages against a third person for enticing away his wife, and depriving him of her society. [Schouler on Husband and Wife, sec. 64.] Proof of pecuniary loss is not necessary to sustain such an action, because the action is based upon loss of the companionship and society of the wife." And in that case we held that the wife, in view of her position under the Married Women's Acts of this State, had a corresponding right of action for the alienation of the affections of her husband and depriving her of his society, whatever doubt might exist

as to such right at common law, citing a number of cases in the courts of sister states wherein a like conclusion had been reached, and the same doctrine maintained.  Additional cases in support of the proposition that the wife has a right of action against other persons for wrongfully enticing away or seducing her husband, are cited in the brief of counsel for respondent, and others may be found in the last (5th) edition of Schouler's Domestic Relations, section 41, note 1.  When this case was here before we construed the petition and held "That the substantial charge in the petition is that defendants wrongfully enticed, influenced and induced plaintiff's husband to abandon her, and to live separate and apart from her, thereby depriving and intending to deprive her of his affection, comfort, society and support;" and that "the ultimate fact which is constitutive of the cause of action in this case, is that of wrongfully inducing the husband to abandon her.   The methods adopted to accomplish that purpose are mere matters of evidence from which the ultimate fact is proved or may be inferred."

While alienation of the affections is often the means by which the separation of husband and wife is effected, and may itself, without producing that effect, constitute a cause of action, as we held in Rinehart v. Bills, 82 Mo. 534, and may be one of the effects resulting from such separation by other means, yet it is not one of the essential elements of the cause of action.   By law the wife is entitled to the aid, support, protection, comfort and society of her husband, and for the wrongful deprivation thereof, by any person, by whatever means and however her husband's affection may be thereby affected, she has a right of action against such person for so depriving her of these material benefits of the marital relation; and although the evidence in this case may not have tended to prove that the defendant at the time this suit was brought had by their conduct succeeded in wholly alienating the affections of her husband from her, it did

tend strongly to prove that by their conduct they had induced her husband to withdraw from her the aid, protection, comfort, society and support of the open marital relations with him to which she was entitled, and to live separate and apart from her, and no sneaking affection he may still have retained (at the time suit was brought) for his wife thus publicly discarded and which failed to procure for her a restoration of those rights, can defeat her cause of action. The trial court, therefore, committed no error in refusing to sustain the demurrer to the evidence and submitting the case to the jury. The instructions given for the plaintiff submitted the main issue in unobjectionable terms, and upon the measure of damages was as definite as the nature of the case would permit. The finding was limited to compensatory damages, although the right to recover was predicated upon the willful and malicious misconduct of the defendants and the defendants have no cause to complain on this score.

We find no error in the instructions given by the court for the plaintiff, and in this connection it may be as well to say that there was no error in refusing to give defendants' instruction number 15, which in effect limited plaintiff's right of recovery to the value of her support and of the association, counsel and whatever of enjoyment of George Nichols' love plaintiff was deprived of up to the time of the commencement of this suit.

II.   As will be seen from the statement, the plaintiff testified in the course of her examination in chief to declarations made by her husband to her in the presence and hearing of his mother and others, in the course of the conversations had by her with the mother, immediately connected with the separation itself, and constituting a part of its *res gestae,* and which were clearly admissible, and to which the examination was carefully confined. On cross-examination, however, counsel for defendants went further and interrogated her as to other conversations had with her husband

privily after the separation, and in regard thereto.    On re-examination as to what he told her, what his father said to him about going to see her on the night of Tuesday, the twenty-eighth of March, was brought out, to which no objection was made at the time, but at the close of her testimony, defendants' counsel moved the court to strike out "all of the testimony of this witness in relation to conversations between her and her husband not made in the presence of a third party."    The motion was passed for the time being, and at the close of the case was renewed by an instruction asked for the defendant and refused by the court, which action is complained of as error.

Conceding that the plaintiff was incompetent to testify to these conversations with her husband, if timely objection had been made, and that evidence improvidently admitted though without objection may be excluded by instruction or stricken out on motion [State v. Robinson, 117 Mo. 649], yet the defendants are not in a position to complain of the action of the court in this behalf, for the reason that having examined the witnesses on these matters about which she had not been questioned in chief, they made her their own witness as to the new matter testified to, and waived her incompetency [Hume v. Hopkins, 140 Mo. 65, and cases cited]; and having examined her as to these new conversations, plaintiff's counsel had a right to cross-examine her thereupon, and thus this evidence was brought out by the deliberate action of defendants' counsel, and *not improvidently,* and they can not complain.    [Hickman v. Green, 123 Mo. 165, and cases cited.]    For the same reason the court committed no error in overruling the objection to that part of the conversation of her husband requesting her to direct her letters to him to Mrs. Tuttle, and leave them with her for him.    Some other exceptions were saved to the rulings of the court on the evidence of this witness, all of which we have examined, but find no material error

therein.    Nor was there any error in admitting in evidence the notices published in the Lamar "Democrat" and in the Liberal "Enterprise."

III.    Mrs. Charlesworth, the plaintiff's mother, in answer to a question as to what was plaintiff's manner and demeanor the evening she returned to her home, after having been shown the notice by the editor of the Liberal paper, answered, over the objection of the defendants, "She threw herself into my arms sobbing."    We do not think this is error.    Under the circumstances this was but a natural and spontaneous physical manifestation of the effect upon her feelings and sensibilities, of one of the acts of her husband and his parents, and might well go to the jury in connection with that act, in order that they might the better appreciate its force and significance.

IV.    The plaintiff, over the objections of the defendant, was permitted to introduce evidence tending to show the pecuniary condition of the defendants, and refused an instruction for defendants excluding this testimony from the jury and limiting their finding to compensatory damages, and this action of the court is complained of as error, but may be easily sustained upon the principles announced in Beck v. Dowell, 111 Mo. 506; Buckley v. Knapp, 48 Mo. 152; Modisett v. McPike, 74 Mo. 636, and Hartpence v. Rogers, 143 Mo. 623.

V.    Some other exceptions were saved to the rulings of the court upon the admission and rejection of evidence, all of which we have carefully examined, but find therein no material error prejudicial to the defendant's case.    Both of the defendants testified at length, and in the admission of their evidence and that of the other witnesses introduced in their behalf, the defendants were treated quite liberally by the court, and we find in its action in the rejection of evidence offered by them no such error prejudicial to the defendants and affecting the merits of the case as would

warrant a reversal.    The defendants were permitted to give
their versions of all the incidents of the married life of these
two young people and their separation, and their own actions
and relations thereto, and in addition to introduce evidence
tending to prove the impecunious condition of the son; that
he still retained an affection for and was willing to live with
his wife at the time this suit was brought, and that defend-
ants were also about that time similarly disposed, and
through other persons made some efforts to bring about such
a consummation.    All this in connection with plaintiff's con-
tradictory evidence thereof, went to the jury for what it
was worth, who were better able to judge of the sincerity
of these efforts put forth under the pressure of an impend-
ing suit for damages than we are.    But giving to this evi-
dence all the weight that can possibly be claimed for it, it
fails to raise a doubt even, but that the defendants by con-
cert of action in a preconcerted determination to separate
these young people, effectuated their purpose, in the man-
ner hereinbefore stated, and although a doubt may arise on
the evidence as to whether the same influence that separated
them has ever since kept them separate, it tends strongly
to prove that it does and will continue to do so, and nothing
in the evidence tends to show any justification for defend-
ants' conduct by which the plaintiff has been deprived of
all her marital benefits.    There was nothing in the situation
of their son in the relation he sustained to the plaintiff that
called for or could justify parental intervention to disturb
and break up the harmonious relations that existed between
them as man and wife.    They were getting along if not
prosperously, at least comfortably and happily together,
and no failure upon the part of plaintiff to fully discharge
any of her duties is disclosed by the evidence.    In it she
appears at all times a true, faithful, loving, industrious and
economical wife, doing her best to promote the family wel-
fare, against whom no charge or insinuation that may have

dropped from the lips of the defendants in extenuation of their conduct, was sustained.

As there was nothing shown to justify the defendants' conduct in separating the plaintiff's husband from her, and as this suit was brought against these defendants jointly, for the part each took in the separation in pursuance of a common purpose, and was so presented to the jury, and as it was not essential to plaintiff's recovery that she should have wholly lost the affections of her husband when the suit was instituted and as there was no excuse for parental intervention, between them, it would seem impossible to conceive of any hypothesis upon which a verdict for the defendants or either of them could be predicated. Nevertheless counsel for the defendants essayed the task, and with great ingenuity produced and presented twenty instructions, the giving of any one of fifteen or sixteen of which would have hypothetically accomplished that result as to one or both of the defendants. We have carefully examined each one of these instructions. Those that are not comments on the evidence or do not unwarrantably seek to limit its scope, predicate a verdict upon untenable theories. The essential features of the defense were presented to the jury in the instructions of the court on its own motion, which seem to have been given in lieu of those asked for the defendants, and we find no reversible error in the court's refusing to give the latter. No good end would be subserved by setting out these voluminous instructions and pointing out in detail the objections to each of them, and we have neither time nor space for that purpose. If some of the facts which the evidence tended to prove, and therein stated as a hypothesis of justification authorizing a verdict for the defendants, had been presented in a proper instruction authorizing the jury to take such facts into consideration in mitigation of damages, such an instruction might perhaps with propriety have been given, and might have been beneficial to the

defendants, but presented as they were the court could not do otherwise than refuse them.

VI. The amount of damages was purely a question for the jury. The verdict is not so large, in the circumstances of this case, as to shock the judicial sense of justice, or to warrant the belief that it was the product of corruption, passion, sympathy or prejudice, and the record presents no ground authorizing an interference on this account.

The judgment is affirmed. All concur.

## ON REHEARING.

BRACE, P. J.—Among the multitudinous instructions asked for the defendant, and refused by the court, there are three—numbered 2, 4 and 7—which may be said to fairly raise the question, whether or not the husband is liable for the torts of the wife, committed during coverture. By its refusal of these instructions the trial cout held that he was; and while this question was duly considered, in the disposition of the case made by the foregoing opinion there was no specific ruling upon it in the opinion, for the reason that as it was not sought to charge the husband, and the case was not put to the jury on the theory of any liability of the husband for the wife's conduct, unless he participated therein, the verdict could not on the facts of the case have been affected by this action of the court even if its theory was untenable. We then thought, however, and the argument on the rehearing has not changed our opinion, that the theory of the court was correct. "At common law, the husband is liable to an action for damages caused by the torts or wrongful acts of his wife during coverture, when the same are prejudicial to the persons or property of others. . . . And the rule applies to the torts of the wife committed both before and during coverture." [Tyler on In. & Coverture (2 Ed.), sec. 233, and cases cited.] This is

not disputed. Ever since the organization of the State, the common law, by positive statutory enactment, has been the law of this State, except where changed or repealed by statute, and it has always been held in this State by a long and unbroken line of decisions, too numerous to cite, that statutes in derogation of the common law must be strictly construed.

The contention of counsel for defendants is, that this rule of the common law has been changed by the statute commonly known as the "Married Woman's Act, Revised Statutes 1889, sections 6864, 6868, 6869 and 6870. From which it is argued that, as by these statutory provisions the husband's common law rights in the property of his wife are abrogated, the reason of the rule has ceased, and the rule itself ought to go with it. With the question of what ought to be the law we have nothing to do; that is a question for the legislative department of the State. The only question that we can determine here is whether the legislature has in fact by these enactments repealed the common law upon this subject. The object of this statute was to remove certain disabilities of the wife, in the marital relation, as it existed at common law. The means adopted to accomplish this end was by conferring upon the wife certain specific rights which she did not have at common law. While the first three sections of the statute are devoted to this subject—the rights and liabilities of the wife—they bear upon their face evidence that the legislature was not unmindful of the liabilities of the husband at common law, and the effect that this legislation would have upon those liabilities, and in the last section limited and defined that effect in the following language: "Sec. 6870. The husband's property, except such as may be acquired from the wife, shall be exempt from all debts and *liabilities* contracted or incurred by his wife before their marriage."

Here, upon the familiar principle of *expressio unius exclusio alterius,* is a positive expression of the legislative intent as to the extent to which this legislation should go in exempting the husband from the liabilities of the wife. Before this enactment he was liable for her torts committed before marriage, as well as during coverture. Thereafter he was to be liable for her torts committed before marriage only to the extent of the property acquired from the wife. If we keep within the legislative intent discovered by the usual rules of interpretation, as is our duty to do, how can we hold that the husband, by virtue of this statute, is not liable for the torts of the wife committed during coverture, as he was before its enactment? In order to do so, we would have to entirely ignore this section of the statute, as counsel do in their argument, disregard the legislative intent so far as it can be discovered from the terms of the statutes, and base our ruling on the assumption that the reasons for the existence of this liability at common law were wiped out by the enactment; therefore, the liability must go with it; this assumption being at the same time unwarranted. For although the absorption of the wife's property by the husband, permitted by the common law, may have been the reason, and a sufficient one, for holding him liable for her torts committed before the marriage, his liability for her torts committed during coverture, while supported by that reason also, had another, a broader, and more enduring foundation in the absolute unity of husband and wife in the marital relation. As contemplated by that law, they were two persons, made one by marriage, one entity—the family —whose head was the husband, with power to control and direct the conduct and action of its members, and with a corresponding liability to society for such conduct and action. This basis, this reason, for the liability of the husband for the torts of the wife committed during coverture remain intact of legislative interference thus far in this

State, and so long as it does remain, there is reason for the liability, whether sufficient or not it is for the legislature and not for the courts to say, and we can not assume that this liability for the protection of society has ceased because a reason therefor no longer exists. When by legislative enactment, marriage in this State becomes a mere civil contract—a mere community of interest based on property —then the reason for the rule may cease to exist, but so long as it remains the sacred relation contemplated in the common as in the Divine Law, a reason therefor must remain.

All the rulings of the appellate courts of this State touching this subject, thus far reported, are in harmony with this view of the effect of these statutes. None are in conflict with it, and in one of those cases [Flesh v. Lindsay, 115 Mo. 1], it was expressly held that both husband and wife were liable for the negligence of the wife's servant—the court saying, after a review of the authorities, "We hold that both at common law and under the statute the defendant and her husband are jointly liable." The cases are all cited in the briefs of counsel on the rehearing, and the citations will appear with the report of this case. The cases from other states, some of which are one way and some the other, and all of which we have examined and considered, are also cited in the briefs of counsel. And as, at the heel of the call we have not time to review them, we must content ourselves with this reference, and the trite observation that courts may sometimes well arrive at different conclusions on the same subject, when those conclusions are governed by variant statutes of different States to be construed *in pari materia* with other statutes of the same State. This may perhaps account for the contrariety in some instances. However that may be, we must construe this statute of Missouri for ourselves, and the construction here put upon it seems to us the only fair

Sanders v. Southern Electric R'y Co.

and logical deduction from its terms, a deduction in harmony with the previous rulings of this court, with the genius and spirit of our institutions, and with the morals, manners and customs of our people.

Since the argument on the rehearing we have gone over the whole case again, and still finding no error for which the judgment of the circuit court should be reversed, the same will stand affirmed as directed in the foregoing opinion. All concur.