PEARL LEAVELL, Respondent, v. W. H. LEAVELL et ux., Appellants.

Kansas City Court of Appeals, June 26, 1905.

HUSBAND AND WIFE: Alienating Affections: Evidence: Conspiracy: Instruction: Compensatory and Exemplary Damages. The evidence and instructions in an action by a wife against her father-in-law and mother-in-law for alienating her husband's affections are reviewed, and it is held by Ellison, J.

(1) That the evidence was sufficient to take a jury's opinion thereon.

(2) That the instructions were erroneous in not requiring the jury to find a conspiracy between the defendants.

(3) That it was proper to ask a defendant whether he ever advised his son to separate from the plaintiff.

(4) That a witness testifying to the defendant's reputation for truth and veracity could, on his cross-examination, be asked if he had ever heard of the defendant's difficulty about a certain money transaction.

(5) That evidence of defendant's wealth as an aid to the measure of punitive damage is admissible, but is not so admissible when there are two or more defendants in the case.

(6) That evidence of defendant's wealth to measure compensatory damages is admissible in a certain class of cases,

Leavell· v. Leavell.

including alienation of a husband's affections, even though there are several defendants; but it should go no further than generally reputed wealth and not descend into specific detail.

(7) Evidence of defendant's wealth to measure punitive damages may so descend into detail.

(8) In a case for alienating the affections and causing an abandonment punitive damages may be allowed.

(9) **Johnson, J.,** in a separate opinion concurs in part and dissents in part.

(10) **Broaddus, P. J.,** in a separate opinion dissents *in toto* because the evidence fails to show a conspiracy.

Appeal from Cass Circuit Court.—*Hon. Wm. L. Jarrott,* Judge.

REVERSED AND REMANDED.

*A. A. Whitsitt, Givan & Glenn* and *Barnett & Burney* for appellant.

(1) The burden of proof is on the plaintiff to show by a preponderance of the evidence that the defendants co-operated together and acted in concert and that such acts and conduct were the cause of the separation of the plaintiff and her husband; and that defendants acted in bad faith, that their conduct and actions were for the deliberate, willful and wanton purpose of separating plaintiff and her husband. Modisett v. McPike, 74 Mo. 647; Strode v. Abbott, 102 Mo. App. 169; Nichols v. Nichols, 147 Mo. 387; Tucker v. Tucker, 32 L. R. A. 624; Gernerd v. Gernerd, 40 L. R. A. 550.

*J. S. Brierly, A. A. Howell* and *T. N. Haynes* for respondent.

(1) There was no error committed by the court in giving instructions asked by plaintiff. Love v. Love, 98 Mo. App. 562; Yowell v. Vaughn, 85 Mo. App. 206; Nichols v. Nichols, 147 Mo. 387; Modisett v. McPike, 74 Mo. 636. (2) The instructions as given for plaintiff, have been approved in similar cases. Love v. Love,

98 Mo. App. 562; Nichols v. Nichols, 147 Mo. 387; Hart-
pence v. Rogers, 143 Mo. 623; Modisett v. McPike, 74
Mo. 636; Yowell v. Vaughn, 85 Mo. App. 206.    (3) To
entitle plaintiff to recover compensatory damages, it
was not necessary for her to either plead or prove mal-
ice, and the mere fact that she alleges more than re-
quired to make out a case, will not deny her the right to
the relief which is both pleaded and proven.    Yowell v.
Vaughn, 85 Mo. App. 210, 211; Hornblower v. Crandall,
7 Mo. App. 220; Hartpence v. Rogers, 143 Mo. App. 632.

ELLISON, J.—The plaintiff's petition in this ac-
tion is for damages resulting to her by reason of defend-
ants alienating the affections of her husband and caus-
ing him to abandon her.    It charges that defendants
(who are husband and wife) "wrongfully, wickedly,
wantonly and maliciously acted, conspired and co-oper-
ated together, with the wrongful, wicked, wanton and
malicious intent to cause and induce" plaintiff's hus-
band to abandon her.    And that in pursuance of said in-
tent, they did, "wrongfully, wickedly, wantonly and ma-
liciously entice, persuade, influence and induce plain-
tiff's husband to leave and abandon her."    The petition
further charges that since causing her husband to aban-
don her, defendants, with the same motive and intent,
have harbored him and kept him away from her.    That
by all of such conduct defendants have caused her hus-
band's affections to become alienated and she has been
deprived of his support, comfort, society and compan-
ionship.    The petition then prays for judgment for com-
pensatory damages of $5,000; and for exemplary dam-
ages of $5,000.

The evidence in behalf of plaintiff and defendants
consisted, mainly, of the testimony of themselves.    It
appears that defendants reside on a farm; that they had
three children, two of whom (a son and daughter) were
married and living to themselves; that the third, Gar-
field, who figures in this controversy, was about twenty-

two years old and lived at home.  That plaintiff, then about eighteen years old, worked for defendants as a domestic in the early winter of 1902 and 1903; that at some time, probably during her stay at defendants' house, the son, Garfield, seduced her under promise of marriage, and she became pregnant.  On the 31st of March, 1903, he and she were married and on the next day he took her to defendants to live, when Mrs. Leavell gave them Garfield's room as theirs.  They lived together at defendants' until the latter part of the following August, except a few weeks when she went to the house of the married son to wait upon his wife in confinement.  In the latter part of August they rented a house and went to housekeeping in a village about one mile from defendants' house.  They lived in that house two weeks when defendant, the father, bought a house and moved them into it in September.  In that month she gave birth to the child and when it was about six weeks old she left the house and went to the hotel in the village to work, for the reason that her husband ceased to stay with her; she however stated that he claimed that she had left him.

It further appears from the testimony of the plaintiff, or, if from other sources, is not disputed, that Garfield's father gave him employment as a general farm hand at $18 per month and board.  That the father being old, of poor sight and hearing, Garfield did the chores at morning and night.  That while he stayed with plaintiff at this house in the village at night, he left early in the morning for his father's (as stated, about one mile distant) and did not get back until about nine o'clock in the evening.  He took his meals at his father's.  That when they went to housekeeping, they used the father's team and wagon in moving, and the father supplied them with a modest housekeeping outfit, though the plaintiff testified that she, "didn't know they (defendants) were going to send us away (to housekeeping) only just at the time, they did send us away

without anything *except what was absolutely necessary.*" She stated that, they "gave me a straw bed, comfort, two old quilts, everything they gave me had been used, had been used quite a while, too; they gave me a pair of pillows, two pair of pillow cases, two sheets, two towels and a skillet without a handle, and that was all in the way of cooking utensils, I believe, I don't remember anything else, and some lard." Further along in her testimony she said that they gave her a feather bed after the baby was born and that they (defendants) "got a small sauce dish pan, one little stew pan, got a stewer, got six plates, six cups and saucers, no spoons, six knives and forks; I only had an old silver knife Mrs. Leavell gave me when we moved, and two old spoons; she gave me them, I had no knives and forks, I had to have knives and forks and Garfield went and got them." Further along, she stated that defendants also gave them flour, bacon, lard, butter, eggs, milk, vinegar, vegetables, apples and chickens. It appears that she also had a stove, a table, carpets, window shades, etc., but whether these were purchased for them by defendants or by Garfield, plaintiff did not know. When she and Garfield were moving away from defendants' house, the old gentleman advised them to live peaceably; that whenever they found themselves getting into a quarrel, to stop and each to take a pinch of salt, that that would perhaps restore their good temper.

The foregoing is undisputed testimony, mainly from the plaintiff herself. She did not deny—and practically admitted—the good advice given them by the old gentleman. She quarrelled back at the old folks, though she said they always began it. But she further testified that upon three or four occasions before she went to housekeeping, defendants said things to her which indicated their desire and wish to be that she and Garfield should separate. That on June 20, Mrs. Leavell told her she might stay with them until she was confined, but after that she did not want her around. That

she would have to leave, but that she would not give Garfield up because he was their only son at home and their only dependence. And that Mr. Leavell said if he could help it his son should not live with her and that he would disinherit him if he did.

At another time while she was in a room overhead and Mrs. Leavell and Garfield were in the cellar, she heard Mrs. L. utter threats which she interpreted to be directed at her. That she began crying and when Mrs. L., coming up into the room, asked her what was the matter, she stated that it looked like she had no friends and that she couldn't even talk to Garfield. Whereupon Mrs. L. advised her to leave him and go to her mother in Illinois, but that she (Mrs. L.) would not give Garfield up. That then Mr. Leavell came in and Mrs. L. told him that plaintiff was quarrelling with her all the time, when the old gentleman said, "I will not have it. If she can't do better than that she had better go and work out." That if he had known what he then knew Garfield should not have married her. Again, at night, on August 14, a short time before she went to housekeeping, she was in her room over the kitchen, when defendants and Garfield were in the kitchen, and she heard them talking and her name used. That Garfield told her that they had to go to housekeeping. The next morning Mrs. L. asked her what she had been crying about, stating that she and Garfield were always quarrelling. That she told Mrs. L. they were not quarrelling —that she was crying because they had to go to housekeeping and that she hadn't anything to keep house with. That Mrs. L. replied that she was always fussing with Garfield and supposed she was then.

It further appeared in evidence that during the time plaintiff went to housekeeping, including her confinement, defendants did not go to see her, though she was provided with a girl to wait upon her and do the cooking. Mrs. L. stated that plaintiff had told her not to visit her. But afterwards, plaintiff wrote her a note

asking her to come to see the baby. She did not go, stating "she thought it best not to."

In consideration of the foregoing we have concluded, though not without hesitation, that plaintiff made a case sufficient to be submitted to a jury. In the light of the relationship these defendants bore to plaintiff's husband, and of the potent undisputed facts, a synopsis of which we have stated, we were strongly inclined to reverse the case outright, but in view of that portion of the evidence in plaintiff's behalf, in which she testifies that for a time after her marriage Garfield was affectionate and dutiful as a husband, and that defendant, Mrs. Leavell, expressed the desire for their separation, plaintiff to go to Illinois to her mother and Garfield to stay with them; and of the old gentleman threatening to disinherit him if he left them, we have concluded it makes a case for the jury to pass upon, notwithstanding the prominent and convincing facts, not disputed, which discredit the plaintiff's testimony.

The face of the entire record discloses a serious and unjust misapprehension of the plaintiff's case. She seems to have regarded defendants as the author of the origin of her unfortunate condition. She must have reasoned that since the defendants were the father and mother of Garfield, and since she committed her unfortunate sin on the faith of his promise, they, as his father and mother, were to blame, and should therefore provide for and shelter her ever after. There is nothing in the record, from open to close, that in the least shows any sense of appreciation of what defendants did for her, nor feeling for the humiliation and disgrace which she and Garfield had brought upon them in their old age. The clear inference from her statement is, that she thought she should have been received by defendants at their home as a member of the family with open arms of welcome. Her testimony is given with a color of criticism of all their actions and a belittleing of all they did. Emphasis seems to be put upon the fact that the

mother assigned them the room over the kitchen when there were other rooms in the house, notwithstanding that was Garfield's room. Her testimony as to what the defendants gave her for housekeeping was given grudgingly, requiring cross-examination to complete the list. She designated the articles as "old" and "little" this and that; even the house the father bought and turned over to them was called a "little house." And, finally, to climax the ill treatment by the defendants, she stated that, "they sent us away without anything *except what was absolutely necessary.*" Her testimony in this respect can have no other inference than that she thought defendants had no right to want them to go to housekeeping; but if they did, they should have adopted a more liberal standard than that of necessity. If mistreated by defendants she should have had the spirit to have rejoiced at the prospects of housekeeping instead of giving utterance to complaints. It is well to add here, that plaintiff, not content with defendants giving Garfield employment whereby he might earn a living, and with having started them out with the necessaries of married life, including daily supplies for the table, her counsel, in cross-examining Mrs. Leavell as to what was given to her when she went to housekeeping, asked if she had given plaintiff any *money*.

But having concluded there was enough in the evidence in plaintiff's behalf to take the case to the jury, we will examine into the proceedings at the trial to see if they are free from substantial error.

As has been stated, the defendants, as husband and wife, are charged to have conspired and co-operated together to do the wrongful acts charged. If they did, they are jointly liable. It was so held by the Supreme Court and this court in opinions by Judges BRACE and BROADDUS, respectively. [Nichols v. Nichols, 147 Mo. 387; Love v. Love, 98 Mo. App. 562.] If Mrs. Leavell did not wrongfully influence Garfield to abandon plaintiff, then the verdict and judgment should not have been

against her.  Or, if Mr. Leavell did not so influence Garfield, but his wife did by acts out of the presence of Mr. Leavell, then the verdict should have been against her and not him.  Nichols v. Nichols, supra, 393, 394. It is therefore clear that when. joint liability is charged on account of conspiring and co-operating, the jury should find there was a conspiracy, co-operation, or concert of action.  But no such hypothesis was embraced in the instructions. Each defendant denies that he or she so influenced him, and both deny any knowledge of the other trying to so influence him.  The jury may have believed Mrs. Leavell and disbelieved Mr. Leavell, or vice versa; and they may have believed a part of plaintiff's story and disbelieved other parts.  It is therefore apparent that manifest error was committed in omitting the hypothesis to which we have referred.  It was duly submitted in Nichols v. Nichols.

Defendant Leavell was asked by his counsel whether he ever advised his son to separate from plaintiff. On objection this was excluded on the ground that the answer would be stating a conclusion.  We do not think so.  It seems to be a plain, ordinary question, to which the objection made, we think, does not apply.  His answer, of course, would have been subject to cross-examination.

The witness, McDonald, testified that Mr. Leavell's reputation for truth and veracity was good.  On cross-examination he was asked if he had ever heard of Leavell's difficulty with a widow concerning some money transaction.  The question seems to have been properly allowed.  [State v. McLaughlin, 149 Mo. 31.]

As was stated at the outset, plaintiff's petition asked for both compensatory and punitive damages.  Evidence was heard as to the amount of property, real and personal, owned by Mr. Leavell, and its separate value in detail.  But at the close of the evidence, just before beginning the argument to the jury, plaintiff's counsel stated that punitive damages would not be asked. Whether this was announced to the jury does not ap-

pear. The evidence as to Leavell's financial condition seems not to have been objected to, but as the claim in the petition for punitive damages remains in the case, the question arising out of such claim may come up at another trial, not only for punitive damages, but, as we shall see, to aid in the measurement of compensation. We will therefore state our views in relation thereto.

Exemplary or punitive damages are allowed to the injured party above and beyond what is allowed him as compensation. The object of the law is to punish the defendant in addition to compelling him to compensate the plaintiff. As the extent of a man's means enters largely into one's judgment in fixing upon a sum which would punish him, his wealth may be shown that the jury may consider what sum would be a punishment to him : It being readily seen that one thousand dollars would not be any more punishment to some than one hundred would be to others of less financial worth. So, therefore, in such actions as slander, libel, assault and battery, seduction, and other aggravated torts, the plaintiff may show the defendant's wealth in aid of the measurement of his punishment. [Buckley v. Knapp, 48 Mo. 152; Hartpence v. Rogers, 143 Mo. 623.]

And so, it seems, in certain cases the defendant's wealth may be shown to enhance the mere compensation which a plaintiff should receive. There are cases in which the *injury* is said to be greater when inflicted by a man of property than by one who is poor. In such cases the defendant's wealth aids to measure the extent of the injury and therefore, necessarily also, the amount of the damage; and thus wealth may be shown, though punitive damages may not be asked. [2 Greenleaf on Ev., section 269; Stanwood v. Whitmore, 63 Me. 209; Johnson v. Smith, 64 Me. 553; Botsford v. Chase, 108 Mich. 432; Chellis v. Chapman, 125 N. Y. 214; Allen v. Baker, 86 N. C. 91; Lawrence v Cook, 56 Me. 187; Bennett v. Beam, 42 Mich. 346.] To the class of cases just

114 app—3

referred to, belong those where the offence consists largely in injury to the feelings, the peace and happiness of the plaintiff and which tends to his humiliation and disgrace. And we are of the opinion that alienation of the affections of the husband or wife whereby he or she abandons the other, would come within that class. And so it was ruled by the Supreme Court in Nichols v. Nichols, 147 Mo. 387; and by this court in Love v. Love, 98 Mo. App. 562. For while the loss of support is a substantial and material element in such injury, yet, humiliation, unrest and unhappiness enter into it, and they are matters for which compensatory damage may be allowed. Not by any absolute, fixed, or mathematical standard, it is true, but yet by way of compensation in an amount to be determined by a jury.

But when such evidence is admissible and is offered to support compensatory damages, the better opinion seems to be that it is improper for plaintiff to go further than to show the fact of defendant's reputed wealth—perhaps the amount he is understood to be worth. For it is his reputed wealth which is understood to be a cause of his standing in the community and which, therefore, adds to the weight and extent of the injury done, or the loss sustained. [Johnson v. Smith, 64 Me. 553; Stanwood v. Whitmore, 63 Me. 209; Kneffen v. McConnell, 30 N. Y. 289; Chellis v. Chapman, 125 N. Y. 214; Stratton v. Dole, 45 Neb. 472.] It was therefore improper for the purpose of compensatory damage for plaintiff to go into the detailed inquiry she did in this case as to Mr. Leavell's property, amounting, as it did, almost to an inventory of his effects.

If, however, the evidence is offered to support punitive damages, it seems to be proper to go into whatever detail is necessary to show the wrongdoer's *actual* worth, so that there may be a proper measure of punishment.

There is also another objection to the course of the evidence in the respect here considered. When, as in

this case, there are more defendants than one, it is not permissible at all to show the wealth of one of them on the question of exemplary damages. For, as the judgment must be against all, *in solido,* it would he highly unjust to allow a verdict against the poorest and most inoffensive wrongdoing defendant to be measured by the same standard that fixed the punishment of the one richest and most culpable. "While all the defendants joined are liable for compensatory damages, there is no justice in allowing the recovery of punitive damages in an action against several defendants, based upon the wealth and ability to pay such damages on the part of one of the defendants only. As the verdict must be for one sum against all defendants who are guilty, it seems to be plain that when a plaintiff voluntarily joins several parties as defendants, he must be held to thereby waive any right to recover punitive damages against all, founded upon evidence of the ability of one of the several defendants to pay them." [Washington Gas Co. v. Lansden, 172 U. S. 534, 552; Smith v. Wunderlich, 70 Ill. 426, 438; Railroad v. Smith, 57 Ill. 517; McCarthy v. DeArmit, 99 Pa. St. 63.] In the last case it was said that if a plaintiff means to ask exemplary damages he should proceed only against the party who should be punished in that way. The case at bar is an apt illustration of the justness of such rule. Here, the proof of wealth was directed to that of Mr. Leavell, and yet the judgment is against both.

But on the question of compensatory damages, even though there be more than one defendant, you may show the wealth of any one, since, as to compensation every wrongdoer is liable for full compensation whether he be rich or poor. In Nichols v. Nichols, supra, a case like this, where both husband and wife participated in the wrongful act, the Supreme Court ruled it proper to show the pecuniary condition of both; but, as will be seen by reference to a statement made at page 402, the verdict was limited in that case to compensatory dam-

ages. In Taylor v. Pullen, 152 Mo. 434, the action was against husband and wife for slander uttered by the wife out of the husband's presence and without his knowledge, and it was said that evidence of the financial condition of the offending party was admissible; and this was said in speaking of both defendants. The point now under review was not made in that case, nor suggested to the court; and we judge it could not have arisen there, since the judgment was for too small a sum to include anything beyond compensatory damages under the liberal view as to what constitutes such damages in this State. Considering the property emancipation of married women in the past several years, it is bad enough to be forced by the common law to say that the husband shall be made to render compensation for the torts of the wife committed out of his presence and against his consent, without going further and *punishing* him by inflicting exemplary damages upon him for the utterance of an unruly tongue which he was powerless to hold.

The result of the foregoing views is this: that plaintiff's case sufficiently made to take a jury's opinion.

1. That the instructions indicated were erroneous.

2. That the evidence referred to was erroneously ruled upon.

3. That evidence of wealth as an aid to the measure of punitive damages is admissible.

4. But that it is not admissible for punitive damages when there are two or more defendants in the case.

5. That evidence of wealth to measure compensatory damages is admissible in a certain class of cases; alienating the affections causing abandonment being of that class, even though there be several defendants.

6. But for such purpose, in such cases, it should not go further than general repute—should not extend into specific detail.

7. If, however, it is offered to measure punitive

damages, actual wealth may be shown by going into detail if necessary to that end.

8.   That in a case for alienating the affections and causing an abandonment of married persons, punitive damages may be allowed.

The judgment will be reversed and the cause remanded.

JOHNSON, J.—I concur in the result with reluctance.  It may perhaps be said of plaintiff's instructions that they did not submit in its entire scope the cause of action pleaded in the respect of failing to require the jury to find that defendants conspired and co-operated to alienate the affections of plaintiff's husband.  I dissent from the views expressed upon all of the other points noticed in the opinion, and particularly disapprove of the criticism of the conduct of plaintiff.  The evidence in my opinion shows she behaved with propriety and moderation throughout the ordeal to which she was subjected by the wrongful acts of defendants.

BROADDUS, P. J., (*dissenting*)—My examination of the case has convinced me that the testimony does not show any concert of action between the defendants which was necessary to entitle the plaintiff to recover. I therefore dissent from the conclusions arrived at by both Judges Ellison and Johnson.

I think the cause should be reversed but not remanded.