BARTON, Respondent, v. BARTON et al., Appellants.

St. Louis Court of Appeals, May 22, 1906.

1. **DAMAGES: Alienation of Affections: Prima Facie Case.** In an action for alienation of affections of her husband brought by the wife against the mother and sister of the husband, the evidence is examined and it is held that there is sufficient substantial evidence to submit to the jury the question as to whether the defendants caused a separation between the plaintiff and her husband maliciously and from improper motives.

2. ——: ——: **Malice: Parent and Child.** In order to sustain an action by a wife against her husband's mother and sister for causing a separation between the two, it must be shown that they not only caused him to abandon the plaintiff but they did it maliciously, that is intentionally and without just cause or excuse. Instructions which authorized a recovery without requiring the finding that the separation was brought about from an improper motive was error.

3. ———: ———: **Conspiracy: Joint Tort.** For an injury caused by the concurrent *negligence* of two or more persons the tort feasors may be sued jointly, but where the torts are *intentional* and independent of each other, though their combined influence may have resulted in the injury, it *seems* there is no joint liability.

4. ———: ———: ———: ———: **Parent and Child.** So where a wife sued her husband's mother and sister for causing him to abandon her, it was necessary to allege and prove not only that the defendants caused the separation maliciously, but that they co-operated and conspired together to bring about that result.

5. ———: ———: **Parent and Child.** A parent may be justified in interfering in the affairs of his child where a stranger would not be permitted to do so and stronger proof is required to make out a case against a parent for causing a separation of a child from his or her spouse than would be required in the case of other persons; and the courts in such case are inclined to exact a strict observance of the rule that the malicious purpose of the parents must be found.

6. ———: ———: ———. The parents' right to interfere in the domestic affairs of their children and from a good motive to advise a child to separate from an intolerable spouse does not depend upon a request by such spouse that they should interfere.

Appeal from Louisiana Court of Common Pleas.—*Hon. David H. Eby*, Judge.

REVERSED AND REMANDED.

*Ball & Sparrow* for appellants.

*Matson & May* for respondent.

The trial court was right in giving plaintiff's instruction No. 9. In Nichols v. Nichols, 147 Mo. 387, this identical instruction was upheld in a case on all fours with the one at bar. The court committed no error in refusing defendants' instruction No. 3, because, if for no other reason, twelve lengthy instructions on the part of defendants were given covering every phase of

the case from defendants' viewpoint. That the law is
well settled in this State on all the issues involved in
this case is conclusively shown by the following author-
ities: Nichols v. Nichols, 134 Mo. 187, 35 S. W. 577;
Nichols v. Nichols, 147 Mo. 387, 48 S. W. 947; Hart-
pence v. Roger, 143 Mo. 623, 45 S. W. 650; Clow v.
Chapman, 125 Mo. 101, 28 S. W. 328; Modisett v. Mc-
Pike, 74 Mo. 636; Linck v. Vorhauer, 104 Mo. App. 368,
79 S. W. 478.

STATEMENT.—Plaintiff, Jewel Barton, is the wife
of Earl Barton, to whom she was married on August
27, 1903, when her husband was nineteen years old and
she eighteen. They lived together until September, 1904,
since which time they have been apart. The defendant,
Eva Barton, is the mother of Earl Barton and mother-
in-law of plaintiff. Defendant Gladys Burkhart is the
married daughter of Mrs. Barton, sister of Earl and
sister-in-law of plaintiff. E. C. Burkhart is the husband
of Gladys Burkhart. The Burkharts have resided in
Hannibal since their marriage. During the period when
most of the occurrences to be related transpired, Mrs.
Barton lived in Louisiana, Missouri, and kept a board-
ing-house at the corner of Tenth and Georgia streets.
She had previously lived in Rockport, Illinois, and had
relatives there and in other places in the vicinity. Dur-
ing the period plaintiff and her husband were living
together and shortly after their marriage, Mrs. Barton
resided temporarily at Summer Hill, Illinois, and at the
time when the marriage of her son and plaintiff oc-
curred, was living at Lonoke, Arkansas, whither her
husband had removed with the family a year or two
before on a business venture. He died there leaving Mrs.
Barton a widow with three children. These children
were Earl, plaintiff's husband, another son named
Henry, and Gladys. After the death of Mr. Barton,
which happened August 8, 1903, Mrs. Barton with
Gladys and Henry, returned to Illinois, but Earl re-

mained in Arkansas. Plaintiff and Earl Barton married at Brinkley, Arkansas, August 27, 1903, or less than three weeks after the death of Mr. Barton. The marriage occurred after an acquaintance of about three months. Plaintiff's parents knew nothing of it and, as we understand, the couple eloped. However, it was not shown that either of the families raised any objection. After the marriage the youthful pair returned to Lonoke. Earl Barton appears to have been a wayward boy, little inclined to industry and much inclined to dissipation. He was of intemperate habits. In October, 1903, he and his wife visited Mrs. Barton at her home in Rockport and remained there until the latter part of the ensuing December. Plaintiff was well received by her mother-in-law and family and by her own admission was treated with perfect kindness, though the pleasure of the visit was marred somewhat by spells of hysterical weeping in which she indulged without apparent cause. During those spells Mrs. Barton consoled plaintiff as best she could and endeavored to administer physical comfort by bathing the latter's head and putting wet cloths on it. On one occasion during the visit plaintiff went out into the yard, sat on the ground for two or three hours and would not come in the house. There was some friction between her and her husband on account of this sort of conduct. Plaintiff would object and give way to weeping every time her husband left the place. On one occasion he was so provoked by her that he went to stay with an aunt. Mrs. Barton telephoned him and insisted on his coming back. Her intercession induced him to do so. Plaintiff swore that when this visit was over she returned to Arkansas "with the utmost good feeling existing between her and Mrs. Barton." We gather from the record that Earl Barton had some money as the proceeds of an insurance policy, which, he, being a minor, his mother had charge of as his guardian and curator. Whatever means of livelihood Earl Barton

and his wife had while they lived together were advanced by Mrs. Barton, who bought them their household furniture and set him up at Lonoke in the grain and feed business. This happened in March, 1904. Plaintiff and her husband first occupied living apartments in the second story of the building in which his store was; not directly above the store, but towards the rear of the building. Plaintiff, becoming dissatisfied with this arrangement, went to live with her mother in Lonoke and Earl went to the hotel. While they were living in the second story of the building above mentioned, plaintiff gave way to crying so much that a merchant whose place of business was beneath, went to her rooms and expostulated, telling her she disturbed people on the street. She replied she would cry as loud as she pleased and when she pleased. Mrs. Barton visited her son and daughter-in-law at Lonoke in March, 1904, and during her visit they again resumed living above the store. Mrs. Barton stayed with them there some and incidentally paid the board bill the pair had incurred at a hotel. Mrs. Barton remained in Arkansas on that visit a week and then returned to Illinois. When she left, her son was staying at the hotel instead of with his wife. Plaintiff complained to Mrs. Barton about living in an up-stairs room, saying she wanted to live "in a house on the ground." Mrs. Barton offered to rent a dwelling in Lonoke for plaintiff and her husband if they would live together; but Earl said, in plaintiff's hearing, that it was no use; that he had tried it and could not stand it. Then Mrs. Barton invited them to come to Illinois and live with her. They came in June and remained two weeks. Mrs. Barton was keeping boarders at the time. During this visit plaintiff had a crying spell and a doctor had to be called. She insisted on getting up in the night and going down town. The only cause assigned in the testimony for these weeping moods is that plaintiff would cry whenever her husband left the house. She said

herself regarding them, she did not want him to go down town because he would drink and go where he had no business; that she "wanted him to stay at home and be somebody." Her crying was not silent weeping, but accompanied by screams which would arrest the attention of people in the street and cause them to stop and listen. Mrs. Barton always tried to console plaintiff, though the latter's behavior distressed her, made her nervous and menaced her business. Plaintiff had a spell of this kind once when attending a ball game during the visit to her mother-in-law in Illinois. Earl wanted his wife to stay in Illinois instead of returning to Arkansas; but she took a notion to go back and screamed and made scenes, until Mrs. Barton told Earl he would have to go with her as she (his mother) could not stand the worry she was under. The two went back to Lonoke, but Earl soon returned to Illinois and stayed until he was telegraphed to come again to his wife. His mother gave him the money to defray the expense of the trip. Shortly afterwards Mrs. Barton moved to Louisiana, Missouri, and opened a boarding-house. Plaintiff and her husband both desired to go to Missouri and live with her. Plaintiff herself swore to this fact. Mrs. Barton objected to their coming on account of plaintiff's scene-making propensity and discontented disposition. Mrs. Barton said she knew plaintiff would not be satisfied for a month and then would want to go back to Arkansas, which would entail extra expense. However, she sent the money to enable plaintiff and Earl to come to her and they arrived September 17, 1904. According to plaintiff's own testimony they were well received; Mrs. Barton seemed glad to see them and had prepared a room for them to occupy. Gladys Burkhart had been married the day before and had gone to Hannibal to reside. The second night after their arrival plaintiff cried and screamed so loudly that some of the boarders in the house told her she was disturbing the neighbors.

For the space of seven or eight days after their return
on the 17th, plaintiff frequently indulged in similar
hysterical spells of weeping and screaming through the
halls of the house, sometimes following her husband to
the street as he started down town. Her conduct ex-
cited protest from the boarders and persons living in
the neighborhood. While on the witness stand plaintiff
admitted these weeping spells, stated that she said she
would cry when she pleased and as loud as she pleased;
that she knew her conduct was humiliating to her rela-
tives, particularly Mrs. Barton, who told her she was
subjecting her (Mrs. Barton) to such humiliation and
worry as could not be endured; but she (plaintiff) cried
none the less on that account and continued to make
scenes every time Earl went down town. She attributed
them to excitement and distress on account of her hus-
band's disposition to drink; and it may be said that gen-
erally they occurred when he wished to go from the
house. They were dwelling at Mrs. Barton's at the lat-
ter's expense and Earl was doing nothing to earn a liv-
ing. Finally Mrs. Barton became so worried and ex-
asperated by plaintiff's behavior that she insisted plain-
tiff must go to her home in Arkansas, which the latter
refused to do. Gladys Burkhart came from Hannibal on
a visit to her mother and she, too, insisted on plaintiff
going home, as she was breaking up Mrs. Barton's home,
business and health. Yet plaintiff testified positively
that Mrs. Barton sought to assuage her feelings and
induce her to be reasonable and, moreover, declared that
plaintiff might live with her (Mrs. Barton) as long
as plaintiff pleased, if she would do right and stop cry-
ing and carrying on so. Plaintiff's conduct continued
as before; so Mrs. Barton gave her son money to buy
a ticket to Arkansas, sent for a carriage and insisted
on plaintiff taking the train home. According to plain-
tiff's testimony she was compelled to get into the car-
riage and was taken to the station. There plaintiff re-

119 App.—33

fused to go to Arkansas and went back to Mrs. Barton's. Plaintiff's reason for remaining with her mother-in-law was that she was unwilling to go unless Earl would go too and Mrs. Barton wanted to keep Earl with her. On the same day Gladys Burkhart came over from Hannibal and declared that, if her mother could not get plaintiff out of the house, she would. She did not however. The upshot of the matter was that, to get relief, Mrs. Barton went to Illinois on a visit. Plaintiff wanted to go with her and Mrs. Barton left the money with her to be used in coming over the next day. She did not go but stayed with Mrs. Lease. As to this matter and Mrs. Barton's efforts at the immediate time to reconcile plaintiff and her husband, plaintiff swore:

"A.    I told you that I could come over the next day, that she would go on that afternoon and I could come the next day.

"Q.    She left you the money with which to come? A.    Yes, sir.

"Q.    You knew then that she didn't know where Earl was, didn't you?    A.    No, sir; I didn't know it.

"Q.    Then didn't either one of you know where he was?    A.    I didn't know where he was.

"Q.    She told you she didn't know, didn't she?    A. Yes, sir.

"Q.    After Mrs. Barton went to Illinois, you say Earl came out to the house?    A.    Yes, sir; on Saturday.

"Q.    How long did he remain there?    A.    From about ten o'clock in the morning until three in the afternoon.

"Q.    Do you know where he went then?    A.    No, sir; I don't.

"Q.    Before Mrs. Barton left the house she hadn't said anything about Earl leaving, had she?    A.    Yes, sir; she told me that afternoon, she told me she was going to try to get him to join the regulars; she thought it would be a good thing for him.

"Q. She had talked to you about you and he living together? A. Yes, sir, she had talked.

"Q. She had tried in every way she could to get you and he to live together? A. I don't know.

"Q. Don't you know she had talked to you both and tried to get you to live together in peace? A. She had talked to us, yes, sir.

"Q. And before she went to Illinois for a rest, she had talked with you about the probability of you and your husband living together in harmony, hadn't she? A. Yes, sir, she had.

"Q. And she told you that if you couldn't live together, the best thing for him to do was to join the army or navy? A. She didn't particularly say that. She said she thought it would be best for him to join the army for three years.

"Q. The day Mrs. Barton went to Pleasant Hill, Illinois, didn't she tell you in the presence of Mrs. Reeds that if you were here when she came back and if you would behave yourself, she wanted you to live with her? A. She didn't tell me in the presence of Mrs. Reeds.

"Q. Did she tell you that? A. Yes, sir; she told me if I wanted to, when she came back, I could stay with her.

"Q. Up to that time, and that was the day she left here, the relations between you and she had been pleasant? A. No, sir, they hadn't.

'Q. And were pleasant when she left? A. No, sir, not very, no, sir.

"Q. Did you tell her you would live with her? A. No, sir.

"Q. What reply did you make? A. I just said, all right, not meaning I would or I wouldn't.

"Q. Didn't you tell Mrs. Barton that if you behaved yourself, you didn't see any reason why you should go home? A. No, sir, I didn't tell her that.

"Q. What did you tell her? A. I told her I didn't want to go home! I wasn't going."

At this time plaintiff did not know where her husband was and his mother professed not to know. He returned to Missouri and saw his wife once after that, and then it seems he wandered off to the southern States and has not lived with her since. Plaintiff continued to dwell with Mrs. Lease, who conducted Mrs. Barton's boarding-house during the latter's absence. Plaintiff afterwards instituted an action against her husband for a divorce, and the present action against Mrs. Barton, Gladys Burkhart and E. C. Burkhart for alienating her husband's affection and causing him to leave her. The foregoing is, in substance, the testimony given by plaintiff, Mrs. Barton, Mrs. Burkhart, Earl Barton, and other witnesses. We will quote the evidence tending to show the defendants caused the separation. There is nothing to show Mr. Burkhart ever saw the plaintiff or had anything to do with her domestic affairs. He is sued as the husband of Gladys Burkhart and responsible for her torts. Hence, when we speak of the defendants, we are to be understood as referring to Mrs. Barton and Gladys, unless Mr. Burkhart is named. A witness by the name of Edmondson testified to overhearing, at his store, the following conversation betwen Mrs. Barton and her son:

"I was sitting at my desk, about middleways of the store, and the side door was open, and Mrs. Barton's son had just been in the store a few minutes before that to cash a check, a twenty dollar check, which I refused to cash; I didn't but the girl did upon my request. Mrs. Barton was coming down the street and Earl Barton came across the street and they met and walked down to the side door where I was sitting at the desk, and Mrs. Barton said to Earl: 'Earl why didn't you make Jewel go home?' and Earl says, 'I couldn't make her go;' and Mrs. Barton says, 'Earl, if you don't leave that woman you are going to run me crazy.' She says, 'Earl, you have spent nearly all your money on that

woman and I am not going to give you any more money to spend on her.' She says, 'Earl, you can stay at your uncle's until I come and I will rent the house to Mrs. Lease's folks for one month and Jewel will go home and Mr. Reeds says he will have Jewel, or Mrs. Jewel Barton, home by next Saturday,' and she gave him something and he started away.

"Q. Did she say what place his uncle was? A. Over across the river somewhere, well, I don't know; over about Pleasant Hill, I think it was she said. 'Over to his uncle's' was the way she spoke.

"Q. Was there anything said further in that conversation about him joining the army? Was that all the conversation, and if not, detail the remainder that you heard? A. Well, here was the next thing she said to him; I never heard a word said about the army—she said this — Mrs. Jewel Barton had ruined his life; ever since he had been married to her he hadn't been worth a snap, or words to that effect; and she didn't want him to live with her any longer, and you got to stay with your uncle until I come.

"Q. What did Earl say? A. He didn't say anything. He stood there with his head down. He was drinking when he was in my place and also when he was with his mother."

Mrs. Lease testified that Mrs. Barton said plaintiff had been the ruination of Earl; that he never would amount to anything so long as he was with plaintiff and she thought the best thing for them was to separate. This witness said she believed plaintiff cried because defendants wanted her to go to Arkansas and leave Earl in Missouri. She swore Gladys Burkhart said plaintiff had to go home and that Mrs. Barton requested the help of the witness in getting plaintiff to leave; also that Gladys said Earl had to go away from the dirty thing and she (Gladys) would furnish the money for him to go on. Mrs. Lease gave this testimony.

"Q. I mean when Earl would start down town, what, if anything, would Mrs. Eva Barton say relative to his going or not going? A. I don't know. He would be gone often before I would hardly know it sometimes; unless it would be during the time there was such confusion and then, of course I would be present then—

"Q. What did Eva Barton say, if anything? A. She told him to go and stay; that was when they was getting her ready to go off.

"Q. In those conversations, what, if anything, did Earl have to say? A. I never heard Earl say a word against Jewel one way or another."

The same witness made the following statement:

"And Jewel was crying and taking on and telling me, and I says 'I wouldn't cry Jewel;' I says, 'I wouldn't think nothing about it, let it go, you will make yourself sick.' Gladys came into the hall and jerked her hands from me and says, 'Let loose of her,' and says, 'Earl has got to leave you, I will see that he does it, I will furnish the money for him to go on.' "

Gala Lease, Mrs. Lease's daughter, swore, among other things, as follows:

"Mrs. Barton said Jewel had to go home and she went to packing the trunk; Earl was in the kitchen, he didn't say nothing, he just let her go.

"Q. What did Jewel say, if anything? A. Jewel said she didn't want to go home; she wasn't going unless Earl went with her.

"Q. What did Mrs. Barton say? A. Mrs. Barton says, 'You must go, and you have to go.'

"Q. Was Gladys there; that is, the first time the trunk was packed? A. Yes, sir.

"Q. What did she do, with her mother, relative to packing the trunk? A. She just talked to Earl and told him he would have to leave her, he mustn't stay with such a thing as she was."

Plaintiff swore she was willing to go home to Ark-

ansas from Louisiana, but she wanted Earl to go with her, and Mrs. Barton said he could not go. Plaintiff and Mrs. Lease gave testimony tending to show that plaintiff's crying spells dated from the time when Mrs. Barton and Gladys Burkhart said Earl could not go to Arkansas with plaintiff. Plaintiff also swore to what Mrs. Barton and Mrs. Burkhart admitted, namely; that they frequently said they could not put up with plaintiff's behavior and she (plaintiff) would have to alter it or leave. When not in her hysterical fits plaintiff appears to have assisted about the boarding-house in the way of making beds and cleaning the rooms. Her entire testimony goes to prove that Mrs. Barton treated her with the utmost consideration, kindness and generosity. Gladys Burkhart treated her well, too, except during the seven or eight days when plaintiff stayed with Mrs. Barton at Louisiana. Gladys was there on a visit or two, and on one occasion was so provoked by plaintiff's screaming in the halls that she told Mrs. Lease if plaintiff did not hush she would gag her. On another occasion as Mrs. Lease said, Gladys declared her mother could not have the home broken up on account of plaintiff, mentioning the latter under a vile epithet.

The court instructed for plaintiff over defendants objection, as follows:

"1. A wife is entitled to the society, companionship, comfort, protection and aid of her husband. The law gives her a right of action against any person who willfully and maliciously entices, persuades, induces or influences her husband to separate or remain apart from her. Therefore, if you shall believe from the evidence that the defendants Eva Barton and Gladys Burkhart willfully and maliciously acted in concert or co-operated together with the purpose and intent to cause the separation of the plaintiff's husband from her and to cause him to remain apart from her, and that they did thereby accomplish such purpose and intent, then your verdict

shall be in favor of the plaintiff, and you should assess her damages at such sum as you may believe from the evidence will reasonably compensate her for the deprivation and loss, if any, of her husband's society, comfort, companionship, protection and aid, provided your verdict should not exceed the sum of ten thousand dollars.

"2.  The law does not justify or excuse parents in willfully and maliciously interfering in the domestic affairs of their married children; therefore, although you may believe from the evidence that the defendants — Gladys Burkhart is the sister and Eva Barton the parent of plaintiff's husband— still if you shall further believe from the evidence that they were guilty of procuring or bringing about the separation of plaintiff's husband from her and causing him to remain apart from her, as in the foregoing instruction stated, your verdict should be in favor of the plaintiff.

"3.  The court instructs the jury that neither the defendant Eva Barton nor Gladys Burkhart had the right voluntarily or unasked by plaintiff to intermeddle with the domestic affairs of plaintiff, and if you find and believe from the evidence that said defendants intentionally urged, persuaded or induced plaintiff's husband to desert and abandon her, and that as a result of such urging, persuasion or inducement, if any, by said defendants, plaintiff's husband did leave and abandon her, then your verdict should be for the plaintiff.

"4.  The court instructs the jury that the wife is entitled to the society, comfort and support of her husband. The law gives a right of action to the wife against any person who entices or persuades him to separate or remain apart from her, and if the jury believe from the evidence in the cause that the defendants Eva Barton and Gladys Burkhart, as charged in plaintiff's petition, intentionally persuaded or induced plaintiff's husband to separate from her and sever the relation of husband and wife, or remain apart from her, and did in fact inten-

tionally effect and bring about a separation, then the jury will find a verdict for plaintiff.

"5. In order to entitle plaintiff to maintain this action it is not necessary that she should prove, by the evidence in the cause, that defendants directly requested plaintiff's husband to leave her, or to remain apart from her, but if the jury believe from the evidence in the cause that defendants, Eva Barton and Gladys Burkhart, were intentionally guilty of such conduct as was calculated to prejudice plaintiff's husband against her, and to alienate him from her, and to induce him to leave her, and to remain apart from her and that such effect was intended by said defendants to be produced and was actually produced by their conduct, then the jury should find a verdict for the plaintiffs.

"6. Plaintiff is not required to prove that said defendants enticed and persuaded her husband away from her by direct and positive testimony, but these facts may be proved by circumstantial evidence, and it is the duty of the jury, in passing on these questions, to take into consideration all the facts and circumstances given in evidence in the cause, and if, from all the evidence the jury believe that said defendants intentionally persuaded plaintiff's husband to separate and remain apart from her and did in fact intentionally effect and bring about such separation, then it will be the duty of the jury to find a verdict for the plaintiff.

"7. If the jury believe from the evidence in the cause that said defendants intentionally prejudiced plaintiff's husband against her, and intentionally caused him to leave her and separate himself from her, and remain apart from her, as charged in plaintiff's petition; and that aside from said defendants' said conduct and influence, he would not have left her, or remained apart from her, then, and in that event, although the jury may believe that plaintiff's husband was addicted to the use

of ardent spirits, or had even become an habitual drunkard, yet the verdict should be for the plaintiff.

"8.   Although the jury may believe from the evidence that plaintiff's husband was addicted to the use of ardent spirits or even had become an habitual drunkard, yet this does not constitute any defense to this suit.

"9.   Although the jury may believe from the evidence that the conduct of plaintiff's husband toward her afforded sufficient grounds for obtaining a divorce from him, and yet if the jury further believe from the evidence that notwithstanding such misconduct on the part of plaintiff's husband, plaintiff was still willing to live with him, and her husband still would not have separated and remained apart from her if it had not been for the acts and conduct and influence of said defendants toward him, and that said defendants purposely and intentionally by such acts, conduct and influence, induced and caused him to separate and remain apart from plaintiff, then the fact of the misconduct of plaintiff's husband toward her does not of itself constitute any defense to this suit.

"10.   If the jury find for the plaintiff, then in estimating her damages they may take into consideration the injury, if any, sustained by her in the loss of the comfort, society, protection, affection, and support of her husband and the wrong and injury, if any, done to her own feelings, character and condition, and assess her damages at such sum, not exceeding $10,000 as from the evidence in the cause they may believe will fairly and reasonably compensate her for said injuries.

"11.   The jury are instructed that although you may believe from the evidence that plaintiff had a just cause for separation or divorce from her husband, yet, she might have elected to abide by her situation and remain with her husband, nevertheless, and if you find and believe from the evidence that she chose to do so, defendants Eva Barton and Gladys Burkhart had no right to

intermeddle with the domestic and marital relations of plaintiff and her husband, and if you find that said defendants voluntarily did so, without plaintiff's request, and with the intention of bringing about or effecting the separation of Earl Barton and his wife, and that as a result of such intermeddling, if any, by said defendants, plaintiff's husband did leave and abandon her, your verdict should be for the plaintiff.

"12. The court instructs the jury that the term 'malice' as used in the instructions in its legal sense does not mean mere spite or ill-will, but it means the intentional doing of a wrongful act.

"13. The court instructs the jury that the word 'willful' as used in these instructions means, 'intentionally, that is, not accidentally.' "

The instructions for defendant were the following:

"1. The court instructs the jury that, under the law, it is no part of the duty of defendants, or either of them, to support the plaintiff or to furnish her a home.

"2. The court instructs the jury that the plaintiff and Earl Barton are husband and wife, notwithstanding that they do not now live together as such. And you are further instructed that it is the duty of the husband, under the law, to support and provide for her; and that if he fails so to do or neglects to provide and support her, then, under the law, she may compel him to do so out of any property he may have. And you are further instructed that it is no part of the duty of defendants, or either of them to provide for or to support plaintiff.

"3. The court instructs the jury that if they find and believe from the evidence in the cause that the plaintiff so demeaned herself, while at the home of the defendant Mrs. Eva Barton, as to worry, annoy and humiliate the defendant, and that by reason thereof, Mrs. Eva Barton insisted that the plaintiff leave her home, then your verdict should be for the defendant Mrs. Eva Barton, unless you find and believe that defendant, as

charged in plaintiff's petition, alienated the affections of plaintiff's husband or caused them to separate.

"4. The court instructs the jury that the plaintiff charges in her petition that the defendants, Eva Barton and Gladys Burkhart, by malicious motives and intent, caused the husband of plaintiff to leave and abandon her. You are therefore instructed that it devolves upon the plaintiff to prove said charges by a preponderance of the testimony, to the satisfaction of the jury, that the defendants did induce and persuade the plaintiff's husband to leave her and separate from and live apart from her, as is charged in her petition. And unless she has so shown by a preponderance of the proof in this cause, then your verdict should be for the defendants.

"5. Although the jury may find and believe from the evidence in the cause that the defendant Eva Barton ordered and directed plaintiff to leave her house and go to her parents' home in Arkansas, and that said defendant directed the husband of plaintiff to secure a carriage to convey the plaintiff to the depot, and furnished the necessary money to pay for her transportation to her parents' home, and that defendant wrote to the mother of plaintiff, asking her to send for the plaintiff, still if you find and believe from the evidence in the cause that defendant did those things because of the conduct, acts, demeanor and behavior of the plaintiff while in the home of the defendant, and not with any intention or purpose to alienate the affections of Earl Barton from his wife or to cause their separation as man and wife, then you are instructed that such acts, upon the part of the defendant, constitute no cause of action against defendants.

"6. Although the jury may find and believe from the evidence in the cause that the defendant Eva Barton suggested that Earl Barton, son of defendant, and husband of plaintiff, join the United States Navy, still, if you further find and believe from the evidence in the

Barton v. Barton.

cause that such suggestion was made in good faith, for the purpose of reforming said Earl Barton, and not for the purpose of inducing him to leave, separate or abandon plaintiff as his wife, then such fact constitutes no cause of action against defendant Eva Barton.

"7. The court instructs the jury that if you believe from the evidence that Earl Barton, the husband of plaintiff, ceased to live with her as her husband and of his own accord, and was not influenced or induced so to do by the defendants, or either of them, your verdict should be for the defendants.

"8. Although the jury may find and believe from the evidence in the cause that plaintiff's husband did separate from and abandon her while they resided at the home of defendant, Mrs. Eva Barton, yet, unless you further find that defendants, or one of them, caused or induced said separation or abandonment, your verdict should be for the defendants.

"9. The court instructs the jury that the defendant Mrs. Eva Barton, had the right, under the law, to order, and, if necessary, to use a reasonable amount of force to compel the plaintiff to leave her house; and, although you may believe from the evidence that said defendant, Mrs. Eva Barton, did order the plaintiff to leave her house, yet such fact alone will not warrant you in finding a verdict for plaintiff.

"10. The court instructs the jury that although you may find from the evidence in the cause that defendant, Mrs. Eva Barton, invited plaintiff's husband to her home and permitted him to remain there, either while alone or with his wife, yet if you find that she did these things in good faith and from good motives, neither seeking nor intending to separate plaintiff's husband from her or alienate his affections from his wife, then such facts do not constitute any cause of action against said defendant.

"11. The court instructs the jury that if, you believe from the evidence in the cause that plaintiff's husband, Earl Barton, separated from and left her on account of her conduct toward him, or her mistreatment, if any, of him, and not because of anything defendants may have done or said, then your verdict should be for defendants.

"12. The court instructs the jury that although you may find and believe from the evidence in the cause that defendant Mrs. Eva Barton did order the plaintiff to leave her house and did tell her that she must go to the home of her parents in Arkansas, yet if you find that she did these things because of the worry, distress of body and mind and humiliation, if any, which the conduct of plaintiff caused her, and not because of any purpose or intention on her part of separating plaintiff's husband from, or of causing him to abandon her, then your verdict should be for defendant Mrs. Eva Barton."

The court refused to grant the following instructions at defendant's request, and an exception was saved to the ruling:

"1. The court at the close of the whole case instructs the jury that under the pleadings and all the evidence in the cause, they will find for the defendants.

"2. The court instructs the jury that your verdict should be for defendant E. C. Burkhart.

"3. Although the jury may believe from the evidence that the defendants, or either of them, induced the husband of plaintiff to cease to live with her as a husband, yet if you further believe from the evidence that said defendants, or either of them, had good reason to believe, and did believe, that the husband of plaintiff had good grounds to so cease to live with her as his wife, your verdict should be for the defendants."

The jury returned a verdict for $1,200 in plaintiff's favor and defendants appealed.

GOODE, J. (after stating the facts).—Plaintiff's theory is that her mother-in-law and sister-in-law desired her to go to Arkansas in order to accomplish a separation between herself and husband. It may be said that there is little, if any, evidence to prove this particular theory is correct. The impression produced is that Mrs. Barton's business was being injured, her boarders annoyed by plaintiff's behavior and she herself broken down in health. On one occasion Mrs. Barton and plaintiff had a conference about Earl's drinking habit and the mother suggested that it would be a good plan to get him in the navy or regular army, where the authorities would make him stop drinking. Plaintiff said if he went into the army or navy she wanted a divorce from him; that if she had to be married to him she wanted him to stay with her and if he was going away she wanted a divorce from him before he went; that she did not want to be tied to him while he lived away from her.

The statement contains the substance of the testimony in this case, as well as we have been able to digest it from a record covering several hundred pages. No digest of the evidence can present an accurate picture of the behavior of plaintiff and the life she led her mother-in-law. Plaintiff's conduct is inexplicable, except on the theory of a nervous condition bordering on or amounting to the disease of hysteria; or else on the theory that she is of a violent temper and sought to force people about her to yield to her will by making humiliating scenes. A child was born to her and died; and it may be that the anxiety and nervousness pertaining to pregnancy, and similar conditions of health after her confinement, had much to do with her strange conduct. There is no testimony to that effect, but the thought occurred to us.

Some of the important facts which stand out prominently on the record of the case are these: Earl Barton was a minor son of Eva Barton when he married plain-

tiff and when he left her. Though the marriage was without her knowledge, Mrs. Barton made no complaint, but accepted the situation pleasantly and did what she could to promote the comfort and welfare of the young couple; she treated them well, showed solicitude for her daughter-in-law's health, took them into her home whenever they wanted to stay with her, until plaintiff's conduct became unbearable; furnished, or offered to furnish, them a separate home at other times; reunited them once when Earl had left the plaintiff; and expressed an earnest desire, in a conversation with plaintiff just before the final separation, for the two to live together.

The question raised for our first consideration is, whether or not there was any substantial evidence to support the jury's verdict. The gravamen of the cause of action in a case like this one, is maliciously inducing one spouse to separate from and abandon the other. [Nichols v. Nichols, 134 Mo. 187, 194; Id., 147 Mo. 387, 401.] Therefore, the question we have stated goes to the sufficiency of the evidence to warrant a finding that Mrs. Barton and her daughter Gladys maliciously induced Earl Barton to separate from plaintiff. A prolonged and attentive study of the entire record has yielded the conviction that those defendants were not the cause of the separation, but that it was brought about by the dispositions and behavior of the plaintiff and her husband; but we have been unable to reach the conclusion that there is no substantial evidence to support the verdict. The witness Edmondson testified positively to hearing Mrs. Barton declare to Earl Barton that he had to leave plaintiff, who was ruining him, and that if he did not leave her, she (the mother) would go crazy. There was testimony that Gladys Burkhart on several occasions said Earl had to go away from his wife and she would furnish the money for the purpose. The testimony of Mrs. Lease and her daughter is of some weight in favor of the finding that Mrs. Barton and Mrs. Burk-

Barton v. Barton.

hart induced Earl to leave plaintiff. All the foregoing testimony is, we think, consistent with the view that the defendants merely wished to get rid of plaintiff until she would comport herself in a rational way, so that Mrs. Barton would not be distressed or her business injured, or Earl Barton confirmed in his bad habits, and without any desire to separate plaintiff's husband from her. Yet the testimony of those witnesses is susceptible of the view that the intention of the defendants was to bring about a separation. Granting that Mrs. Barton and her daughter induced the separation, a material fact is the motive with which they acted, as will appear from the authorities to be cited; which hold that the motive moving a parent to interfere with the marital relations of a child is always of the essence of an action against the parent for inducing a separation between the child and his or her spouse. This doctrine would be inapplicable in favor of Gladys Burkhart, sister of Earl Barton, if the action was against the former alone. But she is jointly sued with her mother in a petition charging, in effect, a conspiracy to bring about a separation; and whatever would justify action of that sort by the mother, would excuse the daughter's help. We have then to decide, not only that there is support for the finding that the defendants caused Earl Barton to abandon plaintiff, but that they did this maliciously; that is, intentionally, and without just cause or excuse. If, in point of fact, the defendants induced the abandonment, the evidence warranted the finding that it was done maliciously, in the legal sense of that word, if the jury believe plaintiff had been guilty of no conduct which justified Mrs. Barton in causing the separation. The evidence may have shown such conduct; but it was not so conclusively shown as to exclude the possibility of a fair inference to the contrary. If there was no good reason why plaintiff's husband should leave her and Mrs. Barton did not

suppose there was, yet, nevertheless the defendants induced the separation, then they intentionally did a wrongful act without just, cause or excuse. On the evidence adduced all those questions might be found either way by the jury.

The case was profusely instructed, but we are not entirely satisfied with the manner in which this was done. One fault in the instructions given at the plaintiff's request is that, considered in the mass, they left out of view the vital fact of the relationship between Earl Barton and his mother and her maternal right to advise and influence him regarding his domestic affairs. Some of the charges made her right to do this depend on a request from the plaintiff, which is not the law. Other instructions erroneously omitted to require a finding that the defendants co-operated to bring about the separation, and others were comments on portions of the evidence. The latter fault occurs, too, in instructions given at the instance of the defendants, which are not the subject of complaint on this appeal. The first and second instructions given for plaintiff are copies of instructions approved by the Supreme Court in Nichols v. Nichols, 147 Mo. 387, 392, and, of course, properly presented the case for the present plaintiff; and we may say stated quite fully the essential facts she was bound to prove to entitle her to a verdict. The fourth, fifth, sixth and seventh instructions given for plaintiff, did not require the jury to find that the defendants co-operated or acted maliciously in inducing the separation and, therefore, are erroneous; or, at least weaken the force of the instructions in which those findings were required and were apt to mislead the jury. This is a case in which we feel that the plaintiff should be held to strict rules, to use the remark of Judge Cooley in a suit against a parent for a like cause of action. [White v. Ross, 47 Mich. 172.] The petition is a copy of the one passed on in Nichols v. Nichols, 147 Mo. 387, and charges

that the defendants "wrongfully and maliciously acted
and co-operated together with the wrongful, wicked and
malicious intent to cause plaintiff's husband to leave and
abandon her and cease living with plaintiff as her hus-
band, and to deprive plaintiff of the aid, support, com-
panionship, society, protection and affection of her said
husband;  . . . .  that the defendants, pursuant to
their said wrongful and malicious intent, did wrongfully,
wickedly and maliciously entice, influence and induce
plaintiff's said husband to leave and abandon her; and
her said husband being influenced by, and acting under,
the said wrongful, wicked and malicious enticement did
then leave and abandon her."  One essential fact to be
proved was that the defendants co-operated with the in-
tention of bringing about the separation.  [Leavell v.
Leavell, 114 Mo. App. 24.]  This is so, not merely be-
cause the petition avers a conspiracy, but because the
nature of the case is such that defendants are not jointly
liable unless they co-operated.  The case is for an inten-
tional and not a negligent tort; one in which each de-
fendant must have designed to cause the resultant mis-
chief.  Where the concurrent negligence of two or more
persons contributes to do harm, the tortfeasors may be
jointly sued, as in the case of a collision between two
trains of different railway companies. [Newcomb v. Rail-
road, 169 Mo. 409, 69 S. W. 348; Miller v. Ditch Co., 87
Calif. 430, 22 Am. St. Rep. 254; Missouri, etc., Railroad
v. Vance, 41 S. W. (Texas) 167; 1 Kinkead, Torts, sec.
46.]  But where the torts are intentional and independ-
ent of each other, though their combined influence may
result in an injury, it seems there is no joint liabil-
ity.  [1 Kinkead, Torts, sec. 44, 45, 46.]

Not only must the defendants have conspired or co-
operated in causing the separation and have done so in-
tentionally, they must also have acted maliciously;
which, as said, means without just cause or excuse.  Cir-
cumstances will excuse a parent for advising a child re-

garding his or her domestic affairs, and even influencing a separation from the child's spouse which will not always suffice to excuse the like interference by other persons. All the authorities support this proposition. And it is especially applicable to the case of a minor child like Earl Barton, who is still under the guardianship of his parent. We are not to be understood as intimating that a parent may, without good cause, influence a child to separate from a spouse; to do so is a tort for which the parent, like any other person, is liable. We mean to say that the law recognizes a superior right of interference on the part of a parent; and will justify the interference for a cause which would be no justification in favor of another person. This rule prevails because of the law's respect for that anxiety parents feel for their children and which impels to efforts to promote a child's welfare and happiness. This natural impulse prompts advice and assistance in domestic troubles, as well as in others. Moreover, there is a moral duty on the part of a parent to look after the child's well-being, even in its adult life; a duty which prevails with greater urgency and force while the child is yet a minor under parental control, and untrained by experience to care for itself. It has been declared that stronger proof is required in an action against a parent for causing a separation between husband and wife than in actions against other defendants. In Pollock v. Pollock, 29 N. Y. Supp. 27, the court said: "Increased intensity of the proof is required in actions of this character, when recovery is sought against a parent. The motives of a parent, in harboring, sheltering, and otherwise extending aid and assistance to a child, are presumed to be good until the contrary is shown. Such is the current of opinion of text-writers and such is ruled in adjudged and reported cases." In Cooley on Torts is this text:

"If, however, the interference is by the parents of the wife, on an assumption that the wife is ill treated to

Barton v. Barton.

an extent that justifies her in withdrawing from her husband's society and control, it may reasonably be presumed that they have acted with commendable motives, and a clear case of want of justification may be justly required to be shown before they should be held responsible." . [Cooley, Torts (2 Ed.), p. 264.]

There is difficulty in applying this rule so as to yield practical results when a jury is the trier of the facts; for, after all is said, if there is evidence for the jury to weigh and it determines that the parent acted without good cause, the comparative weakness or intensity of the proof has no effect. But the spirit of the law may be, and ought to be, recognized to the extent of insisting that the jury be instructed consistently on the necessity of finding a malicious purpose on the part of a parent as a condition precedent to an award of damages. We incline to exact a strict observance of this rule in the present case, and think some of the instructions for the plaintiff were faulty in not requiring malice to be found. The evidence of it is slight. Wherefore, it is the more important that the issue of malice should be held up to the jury in all those charges which attempt to state the grounds of a verdict for plaintiff.

It may not be amiss to notice some of the expressions of the courts in similar cases regarding the law of the immediate point. All the later decisions defer to the authority of Hutcheson v. Peck, 5 John. (N. Y.) 196. The action was for enticing away plaintiff's wife and separating her from him. The wife was the daughter of the defendant. Spencer, J., commented on the novelty of the action, but said that was no argument against its being sustained, and that if a father maliciously and improperly afforded protection even to his child, against the will of her husband and thereby deprived the latter of the comfort he is entitled to enjoy from her aid and society, and action would lie. Thompson, J., said: "Although the light in which the law views a charge of this

description may warrant the maintenance of an action against the father, when the circumstances are aggravated, yet no case of the kind is, I believe, to be found in the books; and in my judgment, such a case ought not to be considered as standing on the same footing as if the action was against a stranger. A father is bound, by the laws of nature, to afford protection and comfort to his child, and the same acts which in him ought to be considered as proceeding from parental affection, might, in a stranger, be deemed to proceed from improper and unjustifiable motives." Kent, C. J., said: "If the defendant did not stand in the relation of father to the plaintiff's wife, I should not, perhaps, be inclined to interfere with the verdict. But that relationship gives the case a new and peculiar interest; this is the first action of the kind I have met with, brought against the father. A father's house is always open to his children; and whether they be married or unmarried, it is still to them a refuge from evil, and a consolation in distress. Natural affection establishes and consecrates this asylum. The father is under even a legal obligation to maintain his children and grandchildren, if he be competent, and they unable to maintain themselves; and according to Lord Coke, it is 'nature's profession to assist and maintain and console the child.' I should require, therefore, more proof to sustain the action against the father than against a stranger. It ought to appear either that he detains the wife against her will, or that he entices her away from her husband from improper motives. Bad or unworthy motives cannot be presumed. They ought to be positively shown, or necessarily deduced from the facts and circumstances detailed. This principle appears to me to preserve, in due dependence upon each other, and to maintain in harmony, the equally strong and sacred interests of the parent and the husband. The *quo animo* ought, then, in this case to have been the test of inquiry and the rule of decision. The judge told the jury

that if the defendant was not actuated by improper motives, it would go very far in mitigation of damages. *I think the instruction should have gone further, and the jury have been informed, in such a case, the verdict should be for the defendant."* (The italics are ours.) Those deliverances of illustrious jurists have furnished the rule by which all later controversies of the same character have been determined in this country; and it may be said that the utterances of Chancellor Kent have been repeated exactly, or in substance, by most judges who have discussed the subject.

In Bennett v. Smith, 21 Barb. 442, which was an action for enticing away plaintiff's wife brought against her parents, the court said:

"In respect to what facts will support an action by a husband for depriving him of his wife, there is, in principle, a clear distinction between the cases where the action is against a parent of the wife, and where it is against a stranger. Parents are under obligations, by the law of nature, to protect their children from injury and relieve them when in distress; and their natural affection for their offspring dictates and prompts to such protection. This is recognized by the common law, and is the foundation of the rules which allow parents to do some things in respect to and in behalf of their children which are not allowed to be done by others, and which in some cases mitigate crimes committed by parents to which they are excited by injuries to their children . . . This duty of protection, in reason and justice, extends to wrongs done or threatened by a husband as well as by other persons, and the acts of parents are entitled to be regarded in the same spirit in such a case as in others. Where the conduct of a husband is such as to endanger the personal safety of his wife, or is so immoral and indecent as to render him greatly unfit for her society, so much so that she would be justified in abandoning him, her parents ought to, and I have no doubt have

the right, not only to receive her into, and allow her the comforts of their home, which even a stranger may do in such a case, but also to advise her to come and remain there.   No parent with ordinary parental feelings will, under such circumstances, hesitate to go so far for the relief of his children, and the common law will not, in my opinion, hold him responsible to the husband in damages for such conduct.   And the same doctrine, in my judgment, is applicable to a case where the advice is given by a parent in the honest belief, justified by information received by him, that such circumstances exist, although the information may subsequently prove to have been unfounded.   It is enough for his protection that he was warranted in such belief, and acted from pure motives. . . .   If the views I have already expressed are correct, the learned justice erred in his instruction to the jury that the father was liable if he advised the wife to stay away from her husband without regard to his motives; and also in excluding the evidence offered.   The matters proposed to be proved, if established, and the father was influenced by them in advising the daughter to remain away from her husband while his habits of drunkenness and   gross immorality and indecency continued, would have fully justified him in giving that advice, and so far as related to that act, constituted a complete defense to him in the action."

In Tucker v. Tucker, 74 Miss. 93, an action against parents for inducing a son to abandon his wife, the court said:

"A few general observations on the law applicable to the conduct of a parent in counseling and advising a married child, in cases of this character, will suffice to show the erroneous view which prevailed in the trial below, without considering seriatim the charges given and refused, or modified by the court.   In every suit of this character, the prime inquiry is, from what motive did the father act?   Was it malicious, or was it inspired

by a proper parental regard for the welfare and happiness of the child? The instinct and the conscience unite to impose upon every parent the duty of watching over, caring for and counseling and advising the child at every period of life, before marriage and after marriage, whenever the necessities of the child's situation require or justify such action on the parent's part. The reciprocal obligations of parent and child last through life, and the duty of discharging these divinely implanted obligations is not, and cannot be, destroyed by the child's marriage. Multiplied instances will occur to the mind in which a failure of the father to speak and to act would be regard-. ed with horror. A daughter who has recklessly contracted an undesirable marriage with a man utterly unworthy to be the husband of a virtuous woman, against the wish and over the vigorous protest of the father, and who has, by such ill-starred union, been brought to wretchedness and humiliation and want of the ordinary comforts of life, may surely be advised, counseled and cared for in the paternal home, even against the will and expressed wish of the unfaithful husband. The question always must be, was the father moved by malice, or was he moved by proper parental motives for the welfare and happiness of his child? In his advice and in his action, he may have erred as to the wisest and best course to be taken in dealing with a question so delicate and so difficult, but he is entitled, in every case, to have twelve men pass upon the integrity of his intentions."

In Huling v. Huling, 32 Ill. App. 519, an action against parents for inducing their son to leave his wife, the court said:

"The instructions given for the defendant advised the jury that a parent has a right in a moderate, intelligent and careful manner to advise a son as to his domestic affairs, and even as to living with his wife, and that if such counsel and advice be given in good faith and from worthy motives, the wife has no cause of complaint,

even though such advice may contribute in some degree to the result of causing a separation. The distinction between the case of a stranger and that of a parent has been frequently recognized and it is no doubt well settled that a parent may, when acting in good faith, give his advice on this important subject, without incurring liability. [Hutcheson v. Peck, 5 Johns. 195; Smith v. Lyke, 13 Hun 204; Payne v. Williams, 4 Baxter 583; Schouler's Domestic Relations, sec. 41; 2 Hilliard on Torts, 510.]"

Other decisions announcing the same doctrine are Pollock v. Pollock, 29 N. Y. Supp. 37; Rice v. Rice, 104 Mich. 371; Burnett v. Burkhead, 21 Ark. 77, 80; Young v. Young, 8 Wash. St. 81; Love v. Love, 98 Mo. App. 562, 569, 73 S. W. 255; Modisett v. McPike, 74 Mo. 636-647.

The third and eleventh instructions given for plaintiff made defendant's right to interfere with plaintiff's domestic affairs depend on a request from plaintiff. We know of no support in law for that theory. If Earl Barton sought advice from the defendants, or they had good cause to offer him advice in regard to his life with plaintiff, the law would justify them in interfering without a request from plaintiff. It has been determined by an eminent court that if a parent believes there is good reason for advising his child regarding the latter's conjugal affairs, the parent is warranted in interfering, even though, in fact no cause existed. [Bennett v. Smith, supra.] The theory declared by the court practically gave plaintiff absolute rights in regard to her conjugal relations without regard to the rights or interests of her husband. It permitted her to justify the interference of the defendants by inviting it, but her husband was accorded no such privilege. The two spouses enjoyed an equality of rights before the law. The essential fact is not so much that defendants intentionally interfered with the purpose to bring about a separation, as that they did so without good cause. An instruction embody-

ing that idea was requested by defendants and refused by the court, though it was an exact copy of one approved by the Supreme Court in Nichols v. Nichols, supra. Expressions are found in some of the instructions to the effect that, though plaintiff's husband had given her good cause for a divorce by his habits, yet if she was willing to abide with him notwithstanding his misconduct, then his bad habits constituted no defense to this suit. That proposition, no doubt, is sound. If Earl Barton was guilty of misconduct entitling his wife to a divorce, but she was willing to condone the injury, the defendants were not justified in inducing a separation because of his misconduct. The error of the charge consists in the fact that no defense of the kind was made. There was not the semblance of a contention by defendants that they were justified in causing a separation on account of Earl's mistreatment of plaintiff. The lines of defense indicated by the testimony introduced and the instructions requested by the defendants were, that they did not cause the separation and that what they said regarding plaintiff living in Mrs. Barton's home and continuing in conjugal relations with her husband, was due partly to the effect of plaintiff's behavior on Mrs. Barton and partly to its effect on Earl. The instructions we are noticing must have been inspird by remarks in the opinion in Modisett v. McPike, 74 Mo. 636, which import that though a wife has just cause for separating from her husband, yet if she elects to abide by her situation, no one, be he parent or stranger, is justified in promoting discord between them and thereby causing a separation. Those remarks were made in a case wherein a man was sued for alienating the affections of another's wife and the defense was that the wife had been estranged from her husband by his bad treatment. Some of the instructions given for the defendant expressed the theory that if the husband's conduct had afforded the wife ground for a divorce, that fact constituted a complete

defense, regardless of whether or not the defendant had advised her to separate from her husband. Instructions given for the plaintiff told the jury that if defendants had prejudiced the wife against her husband and caused the separation and divorce, and that, but for the defendant's influence, these events would not have occurred, the husband's drunkenness and misconduct were no defense. It was ruled that the two sets of instructions were inconsistent and those given for the defendant erroneous. In commenting on them the court said:

"The wife may have a just cause for separation or divorce, but she may elect to abide by her situation and remain with her husband nevertheless. If she chooses to do so, no stranger has the right to intermeddle with the domestic and marital relations of husband and wife, and if he voluntarily does so he is amenable for the consequences. If, on the contrary, the wife having just cause for the separation, or for obtaining a divorce from her husband, voluntarily seeks the advice, shelter and protection of a relative, or even a stranger, then a different rule obtains. In such a case the wife has the unquestioned right to seek and accept the advice and protection of a relative or stranger from the intolerable abuse and wrongs of her husband. And in such case, also, such relative or stranger so affording such protection or advice to the wife, is not answerable to the husband for such conduct, if he acts in good faith and from motives of kindness and humanity. No one unasked, especially a stranger, has the right to volunteer his advice or protection, and if he does so he is amenable. 'It is one thing to actively promote domestic discord, but quite another to harbor, from motives of kindness and humanity, one who seeks shelter from the oppression of her own lawful protector.' It has been well said that 'such conduct, whatever the motive, is exceedingly perilous on the part of a stranger, generally open to misconstruction, and never to be encouraged. They should leave the parties to their

legal remedies against each other. With parents it is different.' "

Whatever may have been the propriety and force of those observations on the facts which gave occasion for their utterance, they do not justify the instructions alluding to the present plaintiff's willingness to condone her husband's misconduct. They referred to the instance of an injured spouse being worked on by a stranger and induced to leave the guilty spouse. According to the hypothesis of the instructions under review, this is the case of a guilty husband being induced to leave a wife whom he had wronged. No one suggested for the defense in this case that a third person, parent or stranger, lawfully might persuade a husband to leave his wife, because he was mistreating her, if she was willing to endure his usage. It confused the issues and was prejudicial to defendants to introduce such a theory into the case.

For the errors noted the judgment is reversed and the cause remanded. *Nortoni, J.,* concurs; *Bland, P. J.,* agrees to the opinion, but dissents from the order to remand, and holds that the case ought to be reversed without remanding it.